Wilson, J.
This is a suit involving the right to the custody of an infant child as between the father and the immediate family of the deceased mother. It is one of that unfortunate class of cases which are painful and distressing to litigants and judges alike, and present to the courts the most perplexing and embarrassing questions with which they are called upon to deal. The grounds for their decision, whatever it may be, are neither clearly fixed nor defined by the law, nor based upon tangible and substantive facts, susceptible of positive proof. It is a *272 matter which calls almost wholly for the exercise of a sound discretion, based, to some extent at least, upon what may be called sentimental considerations, and in accordance with their best judgment of the material interests and welfare of a human being, too young to determine for itself. In so doing, the difficulties of the court are increased by the fact that there is no statute to control nor precedent to guide it. No two of these cases are ever precisely alike, and each must be governed by its own attending circumstances; and in no case is the issue such that it can be gauged and measured by a standard of dollars and cents. In addition to this, the judges who constitute the court fully realize that whatever their decision may be, it will bring deep sorrow to some party, and that they themselves may possibly err in their judgment.
The proceeding was in habeas corpus, and grew out of the following facts. On September 22,1891, Jennie McKercher, who was the daughter of the first named plaintiff in error and the respondent, and the sister of the other respondents, was married at Denver to the relator. The couple went to Iowa, and resided upon the farm of the relator. During the following year a son was born to them. In May, 1893, from causes which it is not necessary here to discuss or to recite, the relations between the married couple seem to have become unhappy and unpleasant, and the wife left, returning to the home of her mother in Denver, where she ever afterwards resided, to the time of her .death. After this separation, on September 10,1893, at Denver, a daughter, Lillian Halcyone, the subject of this controversy, was born. About January, 1895, the relator moved from Iowa to Oklahoma, and there took up his residence, and continues to reside in that territory. Within six months after taking up his residence in Oklahoma, when the child in controversy was about two years of age, the relator commenced suit in an Oklahoma court praying for a divorce from his wife, and that he be decreed to have the custody of the elder child, the son. The defendant appeared in this suit, — at what time, however, we are not advised and is not material, — and resisted the plain *273 tiff’s application. At some time thereafter, plaintiff obtained leave, it appears, to file an amended complaint, and in that he also ashed that he be decreed to have the'custody of the infant child in controversy here. On the 11th day of March, 1897, during the pendency of these divorce proceedings in Oklahoma, the wife, Jennie Green, died at Denver. Upon her deathbed, she committed the custody of the child to these respondents, her mother, sister and brothers, and requested them to retain it. About April 16,1897, the relator appeared in Denver at the residence of the respondents, and demanded the custody of the child, which being refused, he instituted this proceeding in habeas corpus. Upon the hearing, it was adjudged that the custody of the child be awarded to the relator, and the respondents bring the cause on writ of error to this court for review.
The first question to be determined, and one which has been discussed with marked ability on both sides, is with reference to the jurisdiction of this court, it being forcibly urged by counsel for the petitioner that a writ of error will not lie to review the proceedings in the district court on habeas corpus., in the absence of a statute specially providing therefor. It may possibly be true that there is English authority in support of this contention, although it is a disputed question, it being insisted by leading American authorities, to which we will hereafter refer, that this is. not true. It is not necessary for us for the purposes of this case to enter into an exhaustive examination of this disputed contention. The original purpose and object of the writ of habeas corpus having been solely to prevent a person from being illegally deprived of his liberty by unlawful imprisonment, the English authorities to which we have been cited, tending to support the doctrine of the relator, seem to have been based upon the principle that a judgment in a habeas corpus proceeding was not final, and it was not res adjudicata, because the party seeking the aid of the writ had the right to apply as frequently, and to as many different judges as he might see fit, during the time of his imprisonment. This doctrine has apparently been fol *274 lowed by a respectable number of American state authorities. The contrary, however, and we think with far better reason, has been held by an equally respectable, if not weightier line of American decisions. In New York, at an early date,— 1810, — in the court of errors, it was held that a writ of error did lie in such cases. Yates v. The People, 6 Johns. 337. Afterwards, and not before, as intimated by counsel, the principle of this decision was embodied into the legislation of the state, and became the settled statute law. In the decision of this case, one of the senator judges in the course of his opinion aptly said, “ Our law considers it an essential right of a suitor to have his cause examined in tribunals superior to those in which he considers himself aggrieved.” In the separate opinion of Senator Clinton in the same case, pages 456 and 457, the nature of the decision in habeas corpus was thus forcibly and aptly characterized:
“ A judgment is a decision of a court upon the case before it; and the last or final determination of a tribunal is the proper subject for a writ of error. When a court puts an end to an action, by declaring that the plaintiff has either entitled himself or has not, to the remedy he sues for, then it gives a final judgment. * * * The question brought up on a habeas corpus is, is the prisoner legally imprisoned? If the court decide in the affirmative, the deprivation of liberty continues. Is not, then, this a final decision on the case before the court, and does it not deprive the party of the remedy he solicits? The words ideo consideratum est are indeed omitted, and it seemeth supply the place of it is therefore considered; and this is the great subject of difference. And is the Gothic jargon of Norman lawyers and the ridiculous pedantry of the schoolmen still to pervade our temples of justice, and to prostrate principle and right at the feet of sophisticated nonsense ? ”
In 1840, the question came before the supreme court of the United States. Holmes v. Jennison, 14 Peters, 540. It was elaborately discussed in separate opinions by a majority of the judges constituting the court, and five of these, — ■ *275 Taney, Story, McLean, Wayne and Catron, — certainly a brilliant array of legal and judicial talent, concurred in tbe opinion that a writ of error would lie in such case. Only one judge, Baldwin, dissented. The leading opinion was by Chief Justice Taney, and in the course of it he said, after denying that the doctrine as contended for by the relator in this case had been laid down by the English courts, “ Certainly no such decision was given in the case of The Queen v. Paty and others, just mentioned, and wre think it would be difficult to assign any good reason for refusing the writ of error. If a party is unlawfully imprisoned, the writ of habeas corpus is his appropriate legal remedy. It is his suit in court to recover his liberty. In order to be effectual for the purposes for which it is intended, the proceedings must be summary, and the law has accordingly made them so. And if an officer of a state government, in the exercise of an authority forbidden by the constitution of the United States, has deprived an individual of his liberty, why should it be supposed that the summary character of the proceedings by which he must seek to recover it would be deemed by Congress a sufficient reason for denying him the writ of error to this court ?”
In re Hicks, 20 Mich. 129, the question was squarely passed upon. Upon a motion to dismiss the writ of error because the decision of the circuit court upon habeas copus was not reviewable, the court said, “ The constitution has vested this court with a general superintending control over all inferior courts, and has clothed it with power to issue writs of error, habeas corpus, and other original and remedial writs, and we cannot doubt our authority to review by some mode a decision on habeas corpus, when made by the circuit court. To conclude otherwise would detract from the natural meaning of the language of the constitution, and in a manner to exclude jurisdiction in the very cases in which it is to be presumed that jurisdiction would be most essential.”
Other authorities might be quoted, but we do not deem it necessary, as the two cases in support of this doctrine first *276 cited, are the leading American cases on this subject, and the whole question is most thoroughly and exhaustively discussed in them.
■ The constitution of Colorado, article 6, section 2, provides that the supreme court shall have appellate jurisdiction and shall have a general superintending control over all inferior courts, under such regulations and limitations as may be prescribed by law.
In the absence of any statute, one of the inherent, powers of an appellate court is the right to make use of writs known to the common law, and if necessary, to invent new writs or proceedings to suitably exercise the jurisdiction conferred. Wheeler v. Irrigation Co., 9 Colo. 249. If the constitution confers appellate jurisdiction, and no mode is provided for taking the appeal, the case may be brought up on a writ of error, or the court may frame a proper writ. Ex parte Thistleton, 52 Cal. 220.
Whatever grounds there may be, however, for differences of opinion as to the character of the decision or judgment in a habeas corpus proceeding instituted solely to relieve a person from unlawful restraint of his personal liberty, or from imprisonment, and the right to have it reviewed in an appellate court, we think that neither upon sound reason nor well considered authority can there be any when the writ is invoked, as in this case, to determine the right, as between private individuals, to the custody of an infant child.
In The State, Baird pros. v. Baird and Torrey (1868), 19 N. J. Eq. 487, it was said, “ An order made strictly in pursuance of an habeas corpus has the effect simply to remove the unlawful restraint; and hence it has been a debatable question whether such order being of a merely temporary character could be properly the subject of appellate cognizance.” The chief justice after discussing the’ difference between such a proceeding and one affecting the custody of a minor child, in which the decree not only removes the unlawful restraint, but awards the custody of the child, says of the latter that as this question (the award of custody) was in the pleadings *277 and evidence properly before the court, “ It follows as an inevitable corollary that an appeal will lie to sucb decree. That a decree possessed of such characteristics is the subject of appellate revision, so far as is known, has never been denied.”
Foulke v. The People, etc., 4 Colo. App. 519, was a case brought to this court on a writ of error to review a decree in habeas corpus affecting the custody of an infant. It is true that the question of jurisdiction was not raised, in any event not discussed nor determined in the opinion, but that the jurisdiction was assumed and entertained is a matter of weight. If it be so clear as contended that the court was wholly without jurisdiction, it is fairly presumable that it would itself have taken notice of the fact.
In such case, the proceeding assumes the character of a suit between individuals for the determination of a controversy as to their respective rights. The state is not a party. The court in such case must not only determine, as in other cases, whether or not the infant is held in unlawful custody, but must go further. It must determine and adjudge who is entitled to and shall have its custody. Such a decision clearly possesses, in our opinion, every element necessary to constitute a final judgment. It is conclusive between the parties as to the only question and subject-matter before the court and presented in the record, namely, the custody of the child. If the arm of the court is not stayed, the prevailing party may invoke all the power of the court to execute the judgment. It would be as final and conclusive as would be a judgment in replevin as to the right of possession of personal property. In the latter case the successful litigant might not recover the property in controversy, and which is adjudged to belong to him, but, in such event, he might be compensated by receiving its money value. Yet a judgment of this kind may be reviewed in an appellate court. In cases like the one at bar, there can be no pecuniary compensation, and yet such a judgment is not reviewable in a higher court. Such an order, decision, judgment or whatever it may be *278 called, puts an end to that particular action; it leaves nothing further to be done in the determination, becomes res adjudioata, and therefore constitutes a fiual judgment. Doane v. Glenn, 1 Colo. 419 ; Dusing v. Nelson, 7 Colo. 186; Daniels v. Daniels, 9 Colo. 133; Henry v. Ins. Co., 16 Colo. 179; Martin v. Simpkins, 20 Colo. 438; Holmes v. Jennison, supra; Mercein v. People, 25 Wend. 64; State v. Bechdel, 37 Minn. 360; In re Sneden, 105 Mich. 61; Church on Habeas Corpus, § 387; Freeman on Judgments, § 324. It has even been held that a judgment rendered in a proceeding by habeas corpus awarding the custody of a minor child “ until the further order of the court,” is such a final judgment that it may be reviewed in an appellate court. Henson v. Walts et ux., 40 Ind. 171.
In State v. Bechdel, supra, after referring to a former opinion of the court in which it was held that a decision under one writ of habeas corpus refusing to discharge a prisoner, is not a bar to the issue of another writ based upon the same state of facts, the court says: “ While there is room for a difference of opinion, and in fact a conflict of decisions upon this question, yet in view of the origin, history and purpose of this writ as a ‘ writ of liberty,’ we adopted this rule in this class of cases in which the liberty of a citizen is the question directly involved. But such cases are clearly distinguishable, we think, both upon principle and authority, from those in which the writ is sued out merely for the purpose of determining which of two parties is entitled to the custody of an infant child. In the latter, the question is not really whether the infant is restrained of its liberty, but who is entitled to its custody ? It is true that the charge is that the child is unlawfully restrained, etc., but the gist of this charge is not that the child is unlawfully deprived of its liberty, but that such restraint is in prejudice of the right of the relators to its custody. The case is really one of private parties contesting private rights under the form of proceedings on habeas corpus. In our judgment, in such cases, both principle and considerations of public policy require the application of the doctrine of estoppel to judicial proceedings. We therefore hold that *279 a former adjudication on the question of the right to the custody of an infant child brought up on habeas corpus, may be pleaded as res adjudicaba, and is conclusive upon the same parties upon the same state of facts.”
Upon the same subject, Mr. Freeman very forcibly says, § 324, supra, “ The principles of public policy requiring the application of the doctrine of estoppel to judicial proceedings in order to secure the repose of society, are as imperatively demanded in the case of private individuals contesting private rights under the form of proceedings on habeas corpus, as if the litigation were conducted in any other form. Otherwise, as well stated in an opinion of Senator Paige, ‘ Such unhappy controversies as these may endure until the entire impoverishment or the death of the parties renders further continuance impracticable. If a final adjudication upon a habeas corpus is not to be deemed res adjudicaba, the consequences will be lamentable. This favored writ will become an engine of oppression instead of a writ of liberty.’ ”
If it be conceded, therefore, that a writ of error will not lie in this case, a most anomalous condition of affairs is presented. The rights of the respondents to the charge and custody of the child are conclusively affected, because the child is taken from them and given to the relator, and yet they cannot have such judgment reviewed by a higher judicial tribunal as in all cases affecting mere property rights, and, at the same time, they are estopped from instituting another suit in the same or in any other district court to again contest the rights adjudicated in this. The district court hence becomes in this class of cases the court of supreme and final jurisdiction. One judge, in fact, because there is no trial by jury, thus becomes the supreme and final arbiter of the rights of this class of litigants, — rights far more dear, far more sacred, than any rights of property. Unquestionably this is not justice, and equally so, in our opinion, it is not the law.
The sole remaining question is whether, upon the facts *280 presented, the court erred in its judgment awarding the custody of the child to the relator.
It maybe said in the outset that the rule that where the trial is to the court its findings of fact will not be disturbed on appeal unless manifestly against the weight of the evidence, is not applicable to this case. Here there were no findings of fact. These, so far as they have any bearing on the affirmance or reversal of the judgment, are undisputed. There was as to them no conflict of evidence. In any event it would seem, however, that cases of this character are an exception to the usual rule, and that in these it is not only proper, but the duty of the appellate tribunal to examine and pass upon the sufficiency of the evidence to sustain the decision of the trial court. Jones v. Darrall, 108 Ind. 574.
The old rigid rule of the common law, which gave to the father by reason of the paternal relation, under all circumstances except in very extreme cases, a right .to the custody and services of his child superior to that of the mother and of all others, has in modern times been greatly modified and relaxed both in England and America. Now it is almost universally conceded in both countries that this paternal right must yield and be subordinated to the interest and welfare of the child, under the control of the state. As was said by an English judge: “ The child as soon as born is entitled to the protection of British law for his person and property, equally with any other of her majesty’s subjects. • It is his birthright, and it is only that there may be best secured to him the assistance and protection of law, and that he may acquire that education or training which will enable him afterwards to discharge the duty which he owes as well to his country as to himself, that he is placed by law under guardianship during the early years of his life.”
In Mercein v. The People, supra, it was said: “ There is no parental authority independent of the supreme power of the state, but the former is derived altogether from the latter. The moment a child is born, it owes allegiance to the government of the country of its birth, and is entitled to the pro *281 tection of that government. And such government is obligated by its duty of protection to consult the welfare, comfort and interest of such child, in regulating its custody during the period of its minority.”
The American rule is thus tersely summed up by an American text writer on the subject: “ It may be considered as the settled doctrine in American courts that all power and authority over infants are a mere delegated function intrusted by the sovereign state to the individual parent or guardian, revocable by the state through its tribunals, and to be at all times exercised in subordination to the paramount and overruling direction of the state.” Hochheimer on Custody of Infants, p. 16.
It is also well settled in both countries that in proceedings before the courts affecting the custody of an infant child, the paramount and controlling question by which the court must be guided, is the interest and welfare of the child. The American rule is thus stated: “ In some of the earlier cases in this country, the courts were inclined to follow the common-law doctrine that the father had an absolute right to his children superior to that of the mother and all others; but on habeas corpus 'proceedings to determine the rightful and lawful custody, even in states which once followed the common-law rule, and whether the contention is between the father and mother for possession, or between the father and a stranger, the question is now determined upon the more humane ground, generally recognized, that the welfare and interest of the child in controversy is the paramount question under consideration.” Church on Habeas Corpus, § 442.
In Schouler’s Domestic Relations, § 248, it is said: “ In this country the doctrine is universal that the courts of justice may in their sound discretion, and when the morals or safety or interests of the children strongly require it, withdraw their custody from the father, and confer it upon the mother, or take the children from both parents and place the care and custody of them elsewhere. * * * The cardinal pi'inciple relative to such matters is to regard the benefit of the infant, *282 to make the welfare of the children paramount’to the claims of either parent.”
In Kelsey v. Green, 69 Conn. 298, a very recent case, it was said: “ In contests between parents and third persons as to the custody by such parents, the opinion is now almost universal that neither of the parties has any right that can be allowed to militate against the welfare of the infant. The paramount consideration is, What is really demanded by its best interests ? ”
In Merrit v. Swimley, 82 Va. 433, it was said, “ The real question in a case like this is not what are the rights of the father or other relative to the custody of the child, or whether the right of the one be superior to that of the other, but what are the rights- of the child ? ”
In U. S. v. Green, 3 Mason, 482, it was said by Judge Story in a case precisely similar to the one at bar, “ As to the question of the right of the father to have the custody of his infant child, in a general sense it is true. But this is not on account of any absolute right of the father, but for the benefit of the infant, the law presuming it to be for its interest to be under the nurture and care of its natural protector, both for maintenance and education. When, therefore, a court is asked to lend its aid to put the infant into the custody of the father and to withdraw him from other persons, it will look into all the circumstances, and ascertain whether it will be for the real, permanent interests of the infant. It is an entire mistake to suppose the court is at all events bound to deliver over the infant to its father, or that the latter has an absolute vested right in the custody.”
In Richards v. Collins, 46 N. J. Eq. 283, it was said, “ The court will not regard the parental right as controlling, when to do so would imperil the personal safety, morals, health or happiness of the child. In determining this delicate and often difficult judgment, the court looks at the character, condition, habits, and other surroundings of claimants.” The same principle is announced in Foulke v. The People, supra.
Authorities to the same effect could be multiplied indefi *283 nitely, but it is not necessary. Counsel for the relator themselves concede this to be the correct and prevailing doctrine. What citations and quotations we have made were only to show the forcible and emphatic manner in which the principle is enunciated in these leading cases, the grounds upon which it is based, and the reasoning in support of it.
In the case at bar, no moral disqualification in either party is shown, which should prevent them from receiving the custody of the child, and we are hence relieved from the necessity so often thrust upon courts in cases of this character, of weighing evidence tending to assail the character of one or more of the parties. So far as financial ability is concerned, also, the parties are equal. Each is able amply to provide for all the wants of the child, and support it and raise it in that station of life in which it was born. The determination of the case, 'then, depends entirely upon what would be for the best interests of the child, considering its age, disposition, health, and the circumstances under which it has so far passed its life. According to the undisputed evidence, the testimony being furnished by physicians and others whose familiarity and intimacy with the child qualify them to speak intelligently in reference to the matter, the child is of a highly nervous temperament, of a very affectionate disposition, inclined to be delicate. physically, and devotedly attached to the respondents, who have nursed and reared it. It is now nearly six years of age. It has never known its father, the relator, and it does not appear, has ever seen him, unless it be since the record of this case was lodged in this court, and then upon the order of this court. Whatever it knows of home and its surroundings, it has learned from and has connected with, these respondents. Whatever it knows of parental love and affection, its mother having died when it was too young to realize this, it has learned from these respondents. Save from them it has never known nor experienced parental tenderness and care. They have nursed it and ministered to its wants from the time of its earliest recollection. They have ever been to it the only parents that it has known, and it is *284 the instinct of childhood that the tendrils of its confidence and affections reach out and entwine about those who perform to it the parental office. To them it clings in its helplessness, and upon them it relies with undoubting faith for comfort, sympathy and assistance. Its father and his household can under these circumstances be to it in no other light than strangers. What effect it would have to rudely take a child of this age and under these circumstances from its happy home, and transplant it to another among strangers, even though it be the home of the father, does not admit of much speculation.» At most it could be said that it would be only an experiment, and one which might result disastrously to the future of the child. Especially is this the case where, as in this instance, it appears from the evidence that the only female member of the relator’s household is his mother, now about eighty years of age. However willing and zealous she might he to discharge her whole duty to the child, — and there is no evidence to question it, — it is quite apparent, at least extremely probable, that her great age would incapacitate her, to some extent at least, from giving to a female child of the character, age and disposition of the one in question that care and attention which would be required.
We fully realize the strong claims which a surviving parent has to custody of his child, where there can be no objections in the way either of a moral or financial character. Save hi exceptional cases, where it is clear the welfare of the child demands otherwise, his right to the custody is paramount, and should be recognized. It is apparent, however, from what we have stated that this presents an extreme case, and is one of the exceptions to the rule. In a few years, the child will have arrived at an age when its own discretion can be at least consulted, and in the mean time, under the orders of the court, the child may have, through visits from its father, acquired a knowledge of, an acquaintanceship with, and a confidence in him, which would wholly remove all objections to its being given into his custody and care. For a few years at least, it is the opinion of every member of this court that *285 it would, be for tbe welfare and best interest of the child that it remain in the care of the respondents, in the only home which it knows.
For these reasons, it is our opinion that the judgment of the district court should be reversed, and the cause remanded with instructions that a decree be rendered dismissing the writ, and awarding the custody of the child to the respondents, who now have it. This decree should provide that it be without prejudice, upon facts occurring hereafter or changed conditions, to the relator’s subsequently renewing his application for the custody of the-child; and it should also provide, under such rules, regulations and restrictions as may be advisable, that he have the privilege of visiting the child at reasonable times.

Reversed.