### Ex parte SAMS.

(Court of Civil Appeals of Texas. Amarillo. Nov. 15, 1913. Rehearing Denied Dec. 13, 1913.)

1. HABEAS CORPUS (§ 99*) — TRANSFER OF CHILD.

A surrender of the possession of a child by its parents, whether evidenced by a written instrument or resting in parol, is not a contract, and cannot be enforced as such, because neither the child nor its custody is a matter of contract, although the transfer will be enforced if for the benefit of the child.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

2. HABEAS CORPUS (§ 85*)—ACTIONS FOR CUSTODY—EVIDENCE—SUFFICIENCY.

In an action by a father for the custody of his minor child, evidence *held* to establish that the child's maternal grandparents acquired custody lawfully.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 77, 78; Dec. Dig. § 85.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

3. HABEAS CORPUS (§ 99*) — CUSTODY OF CHILD—RIGHTS OF PARENT.

Appellant eloped with the minor daughter of respondents, and upon a reconciliation the runaways made their home with respondents. About two years after the young wife was killed, leaving a child less than a year old. Appellant, the father, left the child with its maternal grandparents, who carefully nurtured it, and were in a position to do so. *Held* that, as the prime consideration in such matters is the welfare of the child, the custody of the maternal grandparents would not be disturbed while the child was of tender years; the father being inexperienced, and the maternal grandmother being able and anxious to take the best possible care of the child.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. § 84; Dec. Dig. § 99.*]

4. HABEAS CORPUS (§ 113*) — CUSTODY OF CHILD — HARMLESS ERROR — ADMISSION OF EVIDENCE.

In habeas corpus for the custody of a child, the erroneous admission of a deposition taken in another suit is not prejudicial error where the same matters were testified to by another witness.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 102–115; Dec. Dig. § 113.*]

Appeal from District Court, Hale County; L. S. Kinder, Judge.

Habeas corpus by Buck Sams for the custody of Robert Andrew Sams. From a denial of his application, he appeals. Affirmed.

C. D. Russell, of Plainview, for appellant. R. M. Ellerd, of Plainview, and Carrigan, Montgomery & Britain, of Wichita Falls, for appellees.

HENDRICKS, J. Buck Sams, the father of Robert Andrew Sams, a minor child, sought to recover the custody of said minor by writ of habeas corpus from appellees, Bob Mitchell and E. A. Mitchell, the maternal grandparents, and, upon hearing before the court, the temporary custody of the infant was awarded to the maternal grandparents Mitchell.

[1, 2] The first contention of appellant is that the district court in a habeas corpus proceeding has no right to inquire into the matter of the fitness of a parent to care for his minor child, unless it is first shown that said parent has voluntarily surrendered his custody of the child to some other person, and claiming that, such voluntary surrender not having been shown in this record, the father, without any further inquiry, was entitled to his child. If we concede the correctness of the appellant's proposition as a legal principle, we are inclined to think that an analysis of this evidence is sufficient to show that the father at one time did surrender the custody of his child to the maternal grandparents, and that the control of the child by the appellees Mitchell, as an original question was not an illegal control. This evidence discloses the marriage of Buck Sams with the daughter of the appellees when he was about 20 years of age and his wife a maiden of about 16. It was a "runaway" match, with a complete reconciliation between all parties immediately following the marriage; Sams and his wife, almost immediately after said marriage, making their home with the appellees, and the child was born in the house of the latter about 14 months after the marriage. Upon the 4th of July, 1913, a deplorable automobile accident occured in the town of Plainview, the home of these people, at a time when Buck Sams was driving the car; the automobile was wrecked, his wife was killed, and at that time the child had been left at the home of the grandparents Mitchell. R. H. Mitchell testified: "After the funeral, and after the return from the cemetery (the funeral took place from our house), old Mr. Sams said, * * * 'We want you to have the baby; we want you to come to see us; and we want to come to see you;' and I said, 'That is fair; I will do the best I can by it.' Buck spoke up, and said, 'I want you to bring the baby to the store to see me.' I said, 'I will whenever I can.' We then went back into the room where my wife was, and about the same conversation took place. Buck was asked if he was going to his father's or stay there (here), and I told him I would furnish him a room, and he could stay there (here) as long as he wanted to. So my wife took charge of the baby, and Buck lived there until about the last of August. During that time he and I talked about the baby two or three times; I asked him if it was his intention to let us have the baby until it is grown, and he said, 'That is what I understand.' I told him I wanted to do the best I could by it, and he replied he was satisfied of that. I then told him I would have some papers drawn up to that effect, so that after I had partly raised it he could not come and take it. Four or five weeks after that I told him the paper was at Mathis & Williams' office, and for him to go and look at it, and he said he would take it and let his father see it before signing it, and I told him that would be all right." It seems that some character of suit was instituted by the appellees Mitchell, against Sams which was dismissed prior to the filing of the present suit by Sams, and with reference to this prior suit and his intentions at that time he said, "I did not make any effort to get the boy until they brought this suit, and did not have at that time any present intentions of taking it," rather corroborative of the relinquishment of the child, asserted by appellees. When young Sams refused to sign the formal instrument, he did not demand the possession of the child, and this refusal would not affect the prior relinquishment of the custody of the child. The surrender of the possession of the child by its parent, whether evidenced by written instrument or in parol, as an attempted transfer of the child, of course "is not a contract, and cannot be enforced as

such, because neither the child nor its custody was the subject-matter of contract." Legate v. Legate, 87 Tex. 252, 28 S. W. 282. The Supreme Court, however, further says in the same case: "It is sometimes said that such a voluntary transfer is 'void,' or that it is 'contrary to public policy'; but the cases using such language show that it is not used in an absolute sense, but in the sense that such transfer is no impediment to the action of the court in determining what is the best for the interest of the child. The law does not prohibit such a transfer, but, on the contrary, allows the child to reap the benefit thereof when it is to its interest so to do." While Buck Sams finally refused to sign a formal instrument several weeks after the previous conversation, in which it is stated that he understood that the Mitchells were to have the baby until it was grown, however, we think the evidence, taken as a whole, is sufficient to show that the status of the maternal grandparents as to the child was not illegal, and think that the court should not have awarded the child to the father without further inquiry as to the best interests of the infant, which in all cases of this character is the paramount issue involved.

[3] Second. The appellant, Buck Sams, strenuously assails the judgment of the trial court by asserting that, "even if the court found that he [the father] had voluntarily surrendered the baby into the custody and keeping of Bob Mitchell and E. A. Mitchell, upon the hearing, the burden was upon the latter to show to the court that he was unworthy of the trust imposed upon him by law to maintain and rear the child;" the relators relying principally upon the theory that the presumption that arises when a parent is demanding the custody of his child, that the best interest of the child is presumed to be with its parent, is not overcome in this record, and cites the case of State v. Deaton, 93 Tex. 244, 54 S. W. 901, by our Supreme Court, as one of the cases convincingly suggestive that the father should recover the custody and possession of his child. Of course we acknowledge all the force attributable to the language of the Supreme Court with reference to the principle enunciated. Our Supreme Court there had a case under consideration where the mother had surrendered the child to a connection whose wife was a distant relative to the applicant to raise and care for the same. Her financial condition and surrounding circumstances at that time were such as to prevent the proper raising and education of this child; but subsequently by marriage her financial condition became very much improved, and her husband joined with her for the recovery of her child. There was no question as to the character of the mother and as to the condition of her husband with reference to the future maintenance and education of this particular minor. The district court and Court of Civil Appeals denied the application of the mother, and the Supreme Court, where no question whatever was raised as to the fitness of the mother, reversed and rendered the case. This question has been before our higher courts several times, and has been often decided by numerous courts of the different states. Every case is bottomed upon the particular facts as this case should be, and in the determination of conflicting rights the guiding star is, of course, the best interests of the child, either temporarily or permanently. As stated, Buck Sams, at the time of the marriage, was about 20 years of age, and only 22 at the time of the trial. Prior to the time of the disagreement between him and the maternal grandparents, they had either lived with the latter or only a block and a half away, and Sams testified that, after they moved from the home of the Mitchells to another home near by, the maternal grandmother had about as much care of the child as its own mother, and at the very time of the unfortunate catastrophe, when the mother was killed, the baby was in the care of these grandparents. The testimony is susceptible of the conclusion that Sams was drunk, and drove the auto at a rather reckless rate of speed, which to some extent contributed to the accident. Sams testified that, although he had run away with the daughter, had signed an affidavit (but not sworn to) that she was over 18 years of age, yet these grandparents, up to the time of the disagreement over the child, had not complained or used a single word of reproach, and the relations between them were amicable in every respect. The several months that he stayed in their house these grandparents provided a home and board for him and his wife without charge. The grandparents testified that when Sams moved to the home near by they visited their daughter nearly every day, and that they still helped to care for the baby, and this continued until the death of his daughter, with the exclusive care thereafter of said child. Buck Sams testified that a short time after the death of his wife, and during a spell of sickness of the child, he went to Galveston for a period of about five days, and said that during the sickness of the child (whether before or after the trip we are unable to infer): "I was not up a single night with the baby. I did not have a room where I could be with it. The baby was very sick during a good part of the time. I did not go down and ask about him a single night." He further said that after he left the home "during September, October, and November, he was not afraid but what the baby would be properly cared for, and he knew that they would take good care of the child." The testimony indicates that young Sams, at least prior to the death of his wife, although by a great many considered as sober and industrious and a hardworking young man, was rather a steady drinker,

keeping whisky at times at his home, and ordering beer by the barrel. He says the reason he left the home of the Mitchells was that Mrs. Mitchell accused him of murdering her daughter. Mr. Mitchell gives an entirely different version of the conversation at that time, stating that when Sams said that he could not sign the instrument prepared by the lawyers for the transfer of the child, and that it would break his mother's heart, his wife replied, "You have not broken any hearts, have you?" Sams further said that the mother, for the purpose of obtaining his signature, held a threat of indictment over his head for the killing of the daughter, and states that when these things occurred Bob Mitchell was present; and Mitchell states that he did state to young Sams that, "You know if it had not been for me you would have been indicted," and further stating to him that there was no intention whatever of having him indicted for anything with reference to that matter.

When Sams left the home of the maternal grandparents, the evidence discloses that they tried at various times to get the father to come and see the child, which was refused by him, on the ground that he did not know what they would do; that he did not feel just right about what they had said to him. On one or two other occasions the child was in an auto in the streets of Plainview, and he was solicited to come and see the child, but refused without any reason. We are inclined to think that the appellant in this instance has exhibited some indifference to the real welfare of the child. Of course we are not pretending to sound the depths of human affection flowing from parent to child; but we do believe that the trial court, under all the circumstances, was entitled to hold that temporarily the best interests of this child were with its maternal grandparents. The prior actions of the father, may have indicated to the trial court some deterioration in that moral force and character which in some degree unfitted him for the supervision of this infant at this particular time, notwithstanding the care and nurture would be with his mother. The child at the time of the trial was shown to be in the very best of health, and the love and affection of the maternal grandparents is strong, and their previous solicitude and successful care undisputed. It is natural that this particular grandmother knows more of the temperament and the physical necessities of this child than any other person living. The record does not show that the paternal grandparents in any one particular had ever had the care of this infant, either in sickness or in health; naturally so, as the mother of this child would turn to her own mother for advice and assistance in the care of her child. The testimony indicates a peculiar and unusual disposition of forbearance upon the part of the appellee Bob Mitchell with reference to the appellant, Buck

Sams. The father of Sams, after his daughter-in-law's death, evidently having in mind the best interests of the child, agreed that it was best for the Mitchells to have the infant. It is true he says that he is willing now to give Buck and the child a home in his house, and that it is his wife's wish, and this court is not drawing any invidious comparisons between the two homes, but the strong attachment of the grandmother Mitchell and the grandfather, it being the only lineal relative, intensified by the association previously and at present existent, with the care at all times manifested for the baby—naturally at this time their knowledge of the child is greater and the attachment stronger. If you eliminate the paternal grandparents and the home offered by them in this case, there could be no hesitation on the part of any court that the appellees should have the child. The evidence indicates that both grandparents are people of comfortable circumstances, the father and mother of Sams being 60 and 45 respectively, and the citizenship and moral worthiness of all unquestioned; Bob Mitchell is 51, and his wife 39, the latter in good health, and in every way capacitated to care for the baby. But the inexperience of the father, taken in connection with other circumstances with reference to his attitude towards the child, aside from the mother and father, would necessarily, when you regard the best interests of the child, lead to this conclusion.

The case of Sturdevant v. State, decided by the Supreme Court of Nebraska, reported in 19 N. W. 618, was one where an infant child, eight months old, was placed in the custody of its grandparents, its mother being dead, and on account of the father's age—23 years—and inexperience of the father of the child, the grandparents' custody was maintained. That court said: "From a careful examination of the authorities at our command, we think the prevailing rule in this country may be briefly stated to be that in controversies similar to this, especially where the infant is of the tender age of the one contended for, the court will consider only the best interest of the child, and make such order for its custody as will be for its welfare, without any reference to the wishes of the parties. * * * It is no doubt true that the defendant in error is greatly attached to this child, and the facts as found by the court show that he is in every respect a suitable person to have its care and custody. But when we consider his age and want of experience we are driven to the conclusion that personally he could not care, for the wants of a child so young and helpless. * . * * The grandparents have had the custody of the child since its birth, are greatly attached to it, have ample means to provide for its wants, and have the judgment and experience so essential and necessary to convince any one that it is better for the

child to remain where it is until such time as its age and condition will justify the father in assuming its custody."

Our own Supreme Court (Legate v. Legate, 87 Tex. 248, 28 S. W. 281), has said in cases of this kind: "The right of the parent or the state to surround the child with proper influences is of a governmental nature; while the right of the child to be surrounded by such influences as will best promote its physical, mental, and moral development is an inherent right, of which, when once acquired, it cannot be lawfully deprived."

As stated, there is no question as to the citizenship of the grandfather Sams and the excellence of his wife, the paternal grandmother. There is, however, the question that the Mitchells know this infant better and are endeared to it deeper on account of the previous association and solicitude in sickness and in health than any other one person; that they understand better its physical well-being, and we all know that a child of this age is to a considerable extent passing through a critical period in infantile existence; probably since the death of its mother, at which time it was about seven months of age, it has been a "bottle baby," sustained by artificial food. We do not say that the evidence shows that the paternal grandparents will not give this child the same attention as the maternal grandparents; but we do say that it is a demonstrated fact, from the birth of this baby, through all infantile vicissitudes, the deep solicitude and successful nurture manifested by the appellees point to the correctness of the trial court's conclusions. The following cases, involving controversies between the parent and grandparents, and decided in favor of the latter, touch this case upon some features of the question involved; the prime consideration in some of the cases being the best interests of the physical condition of the child, and in some of the cases blended with a moral and mental welfare of the infant, and considered by the court in awarding the child to the grandparents who had in the past the care and custody of the infant, and to which we refer without further extending the limits of this opinion: McKercher v. Green, 13 Colo. App. 270, 58 Pac. 406; State ex rel. Thompson v. Porter, 78 Neb. 811, 112 N. W. 286; Gardenhire v. Hinds, 38 Tenn. (1 Head) 410; Ex parte Davidge, 72 S. C. 16, 51 S. E. 269; Jones v. Darnall, 103 Ind. 569, 2 N. E. 229, 53 Am. Rep. 545; Hussey v. Whiting, 145 Ind. 580, 44 N. E. 640, 57 Am. St. Rep. 220.

[4] The appellant insists that the court improperly admitted and considered the deposition of one Runyon and his wife taken in another suit between the same parties; this record disclosing that in that case the same question, that is, the custody of this child, was involved. This testimony purports to reveal certain occurrences between Sams and

his wife and the conduct and condition of Sams on one of the streets of Plainview a short time prior to the accident when Mrs. Sams was killed. The prevailing and influencing considerations indicated in this opinion, requiring, as we think, an affirmance of the judgment of the trial court, devitalize the force of the position of appellants as to any technical error committed by the trial judge in the admission of this testimony, and make it of little weight, if any, in regarding the matter of the real interests of the child, considering its helplessness and the present possession of the Mitchells in ministering to the child for its present welfare. The same testimony was in substance delivered by another witness on the stand, the brother of Runyon, who saw the occurrences detailed in the depositions, and upon the whole we think the error harmless, and overrule the assignment.

The court's judgment in this cause, the form of which we commend, is merely a deprivation of the father, and a permission of the custody of the maternal grandparents, subject to the further order of the court, with the further provision for the right of visitation of the father at all reasonable times for the purpose of seeing the child, and our conclusion is upon the whole that the judgment of the court as to the present custody of this child is proper.

Judgment affirmed.