In the Matter of the APPLICATION OF W. J. SIDLE for a Writ of Habeas Corpus.

(154 N. W. 277.)

**Habeas corpus — by natural parents for custody of infant — paternity and identity concealed — left with strangers for several years — best interests of child — main consideration — adoption without knowledge of natural parents.**

1. Where habeas corpus is brought by the natural parents of an infant for

---

Note.—That the welfare of the child is the controlling feature in suits for its custody is in accord with the well-established doctrine, see notes in 20 Am. Dec.

its custody and control, and it is shown that the child has for a period of almost eight years been left among strangers and its paternity and identity concealed, the pole star and main considerations of the court will be the best interests of such child, and where these interests point, as they are held to point in the case under consideration, to the continued custody of the adoptive parents, the court will not interfere with such control and possession, even though the adoption may have been made without the actual knowledge of the natural parents, and under the belief and on the grounds of their decease.

**Right of custody and possession — as between natural and adoptive parents — means or wealth not alone controlling.**

2. In determining the question of the right to the possession of an infant as between its natural and its adoptive parents and the real interests of the child in such a matter, the relative poverty of the former does not alone, save in extreme cases, furnish a sufficient reason for depriving them of their offspring.

**Right of possession — determination — consideration for child — best interests — its right to the love, care, and guidance of a father and mother — lack of interest by natural parents — wishes of child, when of proper age and intelligence.**

3. In determining the right to the possession of a child in habeas corpus and the best interests thereof as between the natural and the adoptive parents, the court will take into consideration the right of such child to the love, care, and guidance of a father as well as of a mother, and the heartlessness and lack of interest of the natural father. It will also take into consideration the wishes of the infant when the latter is old enough and of sufficient intelligence to reasonably understand the situation in which it is placed.

**Right of possession — determination — the child is but the future citizen — interests of the state in its citizens are paramount.**

4. In determining the right to the control and possession of an infant in habeas corpus, the court will take into consideration the fact that the child is but the future citizen, and that paramount to the interests of the claimants, and even of the natural parents, are the interests of the parent state.

Opinion filed October 4, 1915.

Habeas corpus for the possession of a minor child.
Writ quashed.

330, on the subject of the custody of legitimate child on habeas corpus. Also note in 41 L.R.A.(N.S.) 564, discussing the denial of custody of child to parent for its well-being, and note in 30 L.R.A.(N.S.) 146, on the validity of adoption of child without consent of natural parents.

Statement of facts by BRUCE, J..

This is a proceeding upon a writ of habeas corpus to determine the right to the custody of Herbert Clark, an infant, the controversy being between the natural parents and the parents by adoption of the child, who is now some eight years of age.

The testimony shows that W. J. Sidle and Elsie Edwards (Sidle) were married in the city of Maquoketa, Iowa, on the 28th day of February, 1907, and soon after their marriage removed to Mandan, North Dakota; that about six months after their marriage the child was born; that the father, W. J. Sidle, from false pride, and for fear of the anger of his parents, and on account of his lack of interest in the child and desire to get rid of it, persuaded his wife, who really appears, during all of the times in controversy, to have been persuaded against her will and against her real instincts, to go to St. Paul, Minnesota, that the child might be born there and its birth concealed both from his family and from any friends or acquaintances that they might have in Mandan or the city of Bismarck, where they seem to have been living at the time. Mr. Sidle did not accompany his wife to St. Paul, nor was he present in that city at the time of the birth. Mrs. Sidle was accompanied, however, by a nurse, a Miss Wendell, who seems throughout to have been actuated by a strange but undoubted loyalty to Mrs. Sidle, and later, by an unquestionable affection for the child itself, and so much so that it subjected her to the suspicion, which we find to be unfounded, that she herself was the mother of the infant. On arriving at St. Paul, Mrs. Sidle was taken to a private hospital belonging to a Mrs. White, where the child was born and where she remained for about two weeks. At the end that time the father, W. J. Sidle, came to the city and persuaded his wife to allow the nurse to take the child with her to Iowa so that its birth might be concealed, at any rate until after the period of nine months had elapsed from the time of the marriage. There can be no question that at this time the husband promised his wife that the child would be be returned to her the following spring. One of the arguments by which her consent was gained was that the family would remove to the coast and to entirely new surroundings, and that by these means the age of the child and the real date of its birth could be concealed. For the next two years the baby boy was cared for by the nurse, or, more strictly speaking, his

care was provided for. He was first taken to a hospital in Iowa City, Iowa, where he remained for about two weeks. He was then taken to another hospital at Maquoketa, Iowa, where he remained for eleven or twelve weeks. He was then taken to the house of the nurse, Miss Wendell, which at the time was rented by her to her sister, a Mrs. Reynolds, and the child seems to have been jointly cared for there by the nurse and this sister. Soon thereafter the sister seems to have become so attached to the infant that she contemplated its adoption, and the nurse, fearing complications, took him from her and back to his parents at Mandan, where he stayed for two or three weeks. After this time he was again given by his parents to the nurse and put by her into the custody of still another trained nurse, a Miss Waterbury. Soon thereafter, however, Miss Wendell was compelled to take her blind brother to London, England, to consult a specialist, and on Miss Waterbury declining to take the responsibility for the child in the interim, at the last moment and with the consent of the parents, took the child to London with her. After being absent for sime six weeks, the nurse and child returned to America and upon their return the former learned that her sister, Mrs. Reynolds, and her husband, immediately after the taking of the child from them, which had been done covertly, had procured articles for its adoption, it appearing that in their petition for the same they had alleged to the mayor of Maquoketa that the child was either an abandoned child or that its parents were dead, and it also appearing that these representations were justified by the statements of the nurse herself, who through all the years in controversy seems to have stated to all inquirers that the parents of the child were both dead. Miss Wendell then took the child to Kansas City, where it was cared for for a period of six or seven months in the home of a Mrs. Berry, and from which place he was taken to the home of two maiden ladies in Chicago, where he was left for some time and then taken to the home of two other young ladies, and left there for a period of several weeks. From there he was taken to a Mrs. Palmer at Cedar Rapids, Iowa, and there evidently lovingly cared for for eight months. From there and in 1911 he was again surreptitiously taken by the nurse to Massachusetts and given a home in the house of a Mrs. Roffer. The justification for this removal, as appears to have been the justification in some of the other instances,

being that Mrs. Palmer was becoming too attached to the boy and the boy too attached to her. Mrs. Roffer seems to have been one of those motherly women whom Providence has scattered all over the land, and seems to have taken every care of the child which she could under her limited circumstances. It remained with her nearly a year. From Mrs. Roffer's home the boy was again brought back to Chicago, at which place, though only five years of age, he was tagged and ticketed in care of the conductor and porter to Mrs. Palmer in Cedar Rapids, Iowa. The testimony shows that when he arrived it was at night and was met at the train by Mrs. Palmer, he tearfully insisted that no one should take him from her again. From this time on Mrs. Palmer seems to have lovingly cared for the boy, and to have insisted on knowing something of his antecedents, and to have urged his adoption by someone. Miss Wendell, however, insisted for a time at least that he could not be adopted, and gave Mrs. Palmer to infer that she herself could take care of him. It appears, also, that during the child's first visit to Mrs. Palmer's, he had been taken for a short visit to his parents, and on his return had been left with a Mrs. Stuhr for a short time because he remembered them and their names, and it was thought best not to return him to Mrs. Palmer until he had ceased talking about them. During all of these years, the nurse had furnished some money for the support of the child. Some of it, we have no doubt, was furnished by the parents. There is testimony that they paid in all about $2,500. The evidence, as a whole, hardly justifies this conclusion. We are satisfied that the parents paid some money. We are satisfied, however, that at times at least, the proper clothing, if not the care of the child, was dependent upon the kindness of those with whom he was left, and that even if Mrs. Palmer was, before the taking by the Clarks, which we will later refer to, paid anything for the custody of the child, she for a long time received nothing, and relied merely upon the promise that some money would be forthcoming if a nurses' association and possibly an uncle, whom it was contended, were interested in the child, could furnish the same. About the 12th of November, 1912, the respondent, Charles F. Clark, was told by Mrs. Palmer that she had a little child with her, and at about this time Mrs. Clark was asked by Mrs. Palmer to care for the child while she was away visiting her daughter who was about to be confined. Mrs. Clark con-

sented.  Mrs. Palmer stayed about three weeks.  When she returned she brought her daughter's infant child with her, and on account of the fact that the child, Herbert Clark, seems to have had or was threatened with the whooping cough and the unwillingness of Mrs. Palmer to subject her daughter's infant to the contagion, the child Herbert was left with the Clarks for an indefinite time.  This arrangement was readily consented to by the Clarks, as they had no child of their own and "the little one filled their home."  The child has remained with them ever since, and at no time has he ever slept under any other roof except with Mr. or Mrs. Clark, and at no time, either in the home of the Palmers or of the Clarks, has he ever referred to the Sidles nor mentioned their names.  No payment was made to the Clarks, either by the nurse or by Mrs. Palmer or the Sidles, and, as we believe from the testimony, none was offered until after the formal adoption of the child by them, and then, if at all, not by the Sidles, but by the nurse.

About seven months after the boy came into his family, and on the 19th day of June, 1913, Mr. Clark had himself appointed its guardian. Later and in the early part of the year 1914 he prepared adoption papers, which were then signed by him and his wife, but were not acknowledged or consented to by the mayor as the statute required, until the 19th day of June, 1914.

After the signing of the adoption papers by the Clarks, but before their acknowledging and recording, but after the appointment of Mr. Clark as guardian, and on the 14th day of May, 1914, Miss Wendell attempted to gain possession of the child while he was at school, but was arrested in the attempt.  After this event she visited the Clarks and seemingly acquiesced in their custody of the child and reiterated to them the story that parents were dead.

Later and on the 19th day of June, 1914, the Clarks formally acknowledged the adoption papers, the consent of the mayor was obtained, and the child was formally adopted.  The statutes of Iowa provide that a child may be adopted if its parents are dead or where the child has been abandoned, and it was evidently upon the theory of the death of the parents that the papers were issued.  On this point the Clarks testified: "Before we took out the adoption papers we inquired of Miss Wendell very carefully on that point.  We got what information Mrs. Palmer had on that point.  We got no other informa-

tion except the positive assurance that his parents were both dead. . . .
She (Miss Wendell) told me positively at that time, and other times,
giving us the names and the facts, that his father was John Wenzel and
his mother Catherine Wenzel, and that his father had been killed about
three months before the child's birth and that his mother died a few days
after his birth. Mrs. Palmer told us that she (Miss Wendell) had
told her two different stories that were not entirely harmonious but
both gave the information that the child's parents were both dead."
The telling of these stories is not denied by the petitioners. Miss
Wendell, indeed, admits telling them and several others to the same
effect. At this time also the prior adoption of the boy by Mr. and Mrs.
Reynolds was unknown to the Clarks, but on the fact becoming known
and on the 21st day of February, 1915, the former parties surrendered
whatever rights they had and the boy was readopted by the latter. Even
at this time the Clarks had no knowledge of the true parentage of the
child, nor of the falsity of the stories which had been told by the nurse
in relation thereto, and at no time whatever did the petitioners com-
municate in any way with them until the eve of the bringing of the
present proceeding, that is to say, until May, 1915, nor until that time
did they receive any intimation from anyone of the claims or relation-
ship of the petitioners. During the eight years also which have inter-
vened between the birth of the child and the bringing of the present
proceeding the child has not been in the home of his natural parents
for more than two months in all, and when away was visited by his
mother but once, and by his father only twice, and then clandestinely
and but for an hour or so on each occasion. There can be no doubt that
the nurse was unwilling to lose the control of the child, and was very
fond of him, and that much of her neglect was due to her profession
and to the fact that she was not only called hither and thither by her
general patients, but that she was called upon at numerous and critical
times, in so far at least as the interests of the boy were concerned, to
attend to numerous relatives during serious sicknesses. As far as the
Sidles were concerned, however, there appears to us to have been a
practical abandonment of the boy from the time of his birth to the
time of the bringing of the present proceedings. The child, in fact and
no matter by whose fault, was changed from place to place; at many
times was without sufficient clothing; at many times was uncared for;

and at all times a ceaseless effort seems to have been made to deprive him of the love and affection of those who were drawn to him.

This brings us to the institution of the habeas corpus proceedings. Their story is as follows: Following the adoption of the child, the nurse seems to have tried to keep the fact concealed from its parents, though it is difficult for us to understand how, if they had cared for the boy at all, they could have been ignorant of it. They at any rate allowed months to intervene without taking any steps to assure themselves of the nature of its custody, and, even if we take their testimony at its face value, allowed themselves to be put off by the flimsiest of pretexts and by assurances which no really natural parent would ever listen to. It is a noticeable fact, indeed, that although the record in this case has been loaded with a large number of letters and other exhibits, many of which are utterly incompetent and irrelevant, there is in it not a single letter from either of the Sidles to the nurse, to Mrs. Palmer, to the Clarks, or to any of the various custodians of their homeless child. Be this as it may, however, in May, 1915, Miss Wendell visited the Sidles at Flasher in North Dakota. While she was on this visit the Clarks also by a fortuitous combination of circumstances also came into the state with their newly adopted son on a business and pleasure trip, and with the intention of calling upon the Sidles, whom, after the adoption of the child, they had learned had some knowledge of his parentage, though they had no knowledge or reason to believe even then that the Sidles were the parents themselves. It is in fact unbelievable that if the Clarks had known of such parentage they would have brought the child with them and run the risk of habeas corpus proceedings in a strange state and in a foreign jurisdiction. Mrs. Clark telephoned to know if Mrs. Sidle could see her, Miss Wendell recognized her voice, and, to use the language of Mrs. Sidle, "We got busy and sent for the lawyers."

The petitioner, W. J. Sidle, is a real estate agent in the employ of a land company and earns $1,500 a year. He owns a home in Flasher, North Dakota, which is worth about $2,000, but which is encumbered by mortgages to the amount of $1,100. He also has some interest in a subsidiary land company, which seems to have been formed by him and his fellow employees for the purpose of dealing in what he terms "real estate snaps." The extent, however, of that business or of that interest

is not shown. Flasher is a town of about four hundred inhabitants, with good schools and churches, as is the case with almost all Dakota towns, no matter how small. The Clarks are worth about $50,000 and have an annual income of from $6,000 to $8,000. They are conceded to be of high repute in their community, and are cultured and refined. They have no children of their own. Mr. Clark is a lawyer. The church and educational facilities of Cedar Rapids are excellent. Since taking the boy into their household, the couple have taken the best possible care of him, and have given him every possible advantage. His appearance and demeanor is that of one who has been well trained and well cared for. He appears and expresses himself as being perfectly happy and thoroughly contented with his present lot.

Some question has been raised as to the paternity of the child. We are satisfied, however, that the boy is the child of the petitioners, W. J. Sidle and Elsie E. Sidle, and of none others, and, though conceived out of wedlock, was legitimatized by the marriage of these parties some six months before its birth. It also appears that the child was first named Brice, but that a few years after his birth the name was changed by the parents and Miss Wendell to Herbert, so that his identity could be the better concealed.

*H. R. Bitzing, Robert Nash,* and *Charles W. Farr,* for petitioners.
*Aubrey Lawrence,* and *James H. Trewin,* and *Hyland & Madden,* for respondents.

BRUCE, J. (after stating the facts as above). Although the proceedings are, in their form, proceedings under the writ of habeas corpus, the personal liberty of the child is only technically involved, and the whole question in controversy is the right to his custody and possession. In such a case the court sits more as a court of equity than as a court of law. Its controlling consideration must be the interests of the child, and its paramount duty is to leave that child where those interests will be the best subserved. Knapp v. Tolan, 26 N. D. 23, 49 L.R.A.(N.S.) 83, 142 N. W. 915; Hochheimer, Custody of Infants, 96; People ex rel. Humex v. Phelps, 58 Misc. 625, 109 N. Y. Supp. 943; Kelsey v. Green, 69 Conn. 291, 38 L.R.A. 471, 37 Atl.

679; Sheers v. Stein, 5 L.R.A. 781, and note (75 Wis. 44, 43 N. W. 728), note in Ann. Cas. 1914A, 739.

It was given to the little wanderer to himself state the law of his case, and to furnish the irresistible argument to which no court ever has or ever should turn a deaf ear. Four or five months after he had first come to the home of the Clarks, and as he was sitting one Sunday morning between them on a davenport, he turned to his foster parents and said: "Papa, mamma, God gives every little folk a papa and a mamma and a home, and you are the papa and the mamma that God has given me, and this is my home, and I am going to stay here." After wandering about for six years, after being taken from place to place, and after being constantly and purposely removed from those who had begun to become attached to him as soon as that attachment became apparent; after being deprived of that which is dearer to every child, and in fact to every human being, than food or drink or raiment or wealth or power, and that is simple and genuine love,—the little wanderer had at last found a haven of rest. He had not merely found the physical comforts and opportunities which wealth furnishes, but he had found love. He had found not merely a mother, but a father. God does intend to give "to every little folk a papa and a mamma," and it is the dread of the lack of the former if the custody of the child is given to the petitioners, that largely controls our decision in this case. In arriving at our conclusions we do not consider the relative wealth of the respondents and of the petitioners and the material advantages which money can furnish. We agree thoroughly with counsel for the petitioners that this question of wealth should not be controlling.

We are fully aware of the dominating interests of natural parents. We realize that often the wealth of parents has been a stumbling block to the progress of their children, rather than an advantage. We agree with the supreme court of Georgia that poverty alone furnishes no reason to deprive a parent of his offspring, and that the greatest characters in history have been those who have been born in the manger and in the log cabin, rather than in the palace. See Cormack v. Marshall, 211 Ill. 519, 67 L.R.A. 787, 71 N. E. 1077, 1 Ann. Cas. 256; Re Carter, 77 Kan. 765, 93 Pac. 584; Sloan v. Jones, 130 Ga. 836, 62 S. E. 21; Monk v. McDaniel, 116 Ga. 108, 42 S. E. 360; Lamar v. Harris, 117

Ga. 993–997, 44 S. E. 866; Wohlford v. Burckhardt, 141 Ill. App. 324; Holmes v. Derrig, 127 Iowa, 625, 103 N. W. 973.

We believe, however, that a child is entitled to both a father and a mother, and that the love and guidance and support of the one is as necessary to him as is that of the other. We believe that Mrs. Sidle loves the child. We believe that although through the long years of separation that love was not strong enough to induce her to absolutely insist upon the presence of the boy, she nevertheless constantly yearned for him. We might be willing to pass over the failure of this insistence, and justify it on the ground that she was hoping against hope that sometime the boy might be brought to her without any disclosures as to his past. But we still have the man Sidle. Without his sincere affection and co-operation, and without his love, a change from the custody of the Clarks to that of the Sidles must be ruinous in its consequences. In a home of love and sympathy and interest, the boy might soon forget the advantages which the resources and affection of the Clarks have been able to afford him. He might, like many another child, grow into a finer and a stronger man were he deprived of these material advantages. But he must have love and guidance, and that ungrudgingly bestowed. At first he would be heartbroken at the change and dissatisfied with his new surroundings. He must have those who will bear with him, who will love him and who will guide him. We think that he might count upon the loyalty of his mother, but we dare not trust the father, and the wife during eight years has been dominated by that father. He tried to destroy the child before he was born. He sent him out a wanderer when only two weeks old, and kept him as such for nearly eight years. Through his agent, Miss Wendell, he purposely deprived him of the companionship even of strangers when those strangers began to show any signs of genuine affection for him. He has never really adequately provided for his wants, even those which were physical. Even now he gives no evidence of affection,—merely a willingness that his wife shall have the boy, and he only brought the present suit because she insisted upon it and because the time had arrived when silence was longer impossible. Can we send the child to such a home as this? We know that in the home of the respondents he will be properly trained and educated. We know that in that home he is radiantly happy. We know that for the first

time in his life he has really entered into a haven of rest.   We do not know that such things would be true if he were given to the petitioners. No court should lightly set aside the claims of natural parents, but must a child who has been treated unnaturally for eight years, and who has at last come to his own, be again subjected to the risk of ill treatment merely because of the fact of relationship?   The boy is now at an age where he needs the guidance of a father as well as of a mother; at an age where an unkind word coupled with the knowledge of the past might again send him a wanderer upon the face of the earth.   We dare not run the risk of the change.   We refuse to "treat the child as a shuttlecock, weaving affection here and there, with no permanency whatever."   Gray v. Field, 10 Ohio Dec. Reprint, 170.

In refusing to interfere with the present custody of the infant, and in quashing the writ of habeas corpus, we are following not merely the dictates of our own consciences and of our own judgments, but the almost unanimous decisions of the courts of the country which have been rendered under similar circumstances.   See Re Burdick, 91 Wis. 639, 40 L.R.A.(N.S.) 887, 136 N. W. 988; Armstrong v. Stone, 9 Gratt. 102; Church, Habeas Corpus, §§ 440–442; Green v. Campbell, 35 W. Va. 698, 29 Am. St. Rep. 843, 14 S. E. 212; Sheers v. Stein, 75 Wis. 44, 5 L.R.A. 781, 43 N. W. 728, 3 Mod. Am. Law, 346.

An examination of the child has been made, and his desire is certainly to stay with the Clarks, and in a case such as this the wishes of the child may well be considered.   People ex rel. Humex v. Phelps, 58 Misc. 625, 109 N. Y. Supp. 943; Richards v. Collins, 45 N. J. Eq. 283, 14 Am. St. Rep. 726, 17 Atl. 831; People ex rel. Wehle v. Weissenbach, 60 N. Y. 385; Com. v. Hammond, 10 Pick. 274; Merritt v. Swimley, 82 Va. 433, 3 Am. St. Rep. 115; Re Gould, 174 Mich. 663, 140 N. W. 1013; Neville v. Reed, 134 Ala. 317, 92 Am. St. Rep. 35, 32 So. 659.

We must also remember that, after all, the child is but the future citizen, and that paramount to the interests of any of the parties to the litigation, and even of the parents themselves, are the interests of the parent state.   McKercher v. Green, 13 Colo. App. 270, 58 Pac. 406.

The writ of habeas corpus will be quashed.   Each party will pay his own costs.