## PASTOR v. SHARP.

4-8325 205 S. W. 2d 855

Opinion delivered November 17, 1947.

Rehearing denied December 15, 1947.

*C. L. Polk, Jr.,* for appellant.

*Hal B. Mixon,* for appellee.

ROBINS, J. This is a controversy between appellant and appellee, her former husband, over the custody of their seven-year-old daughter. The appellant asks us to reverse the decree of the lower court which was in favor of appellee.

The parties to this suit were married in 1938. They lived together as husband and wife until in August, 1944, at which time appellant left her husband and returned to the home of her mother in Tennessee.

Appellee, on December 20, 1944, instituted suit against appellant in the lower court, asking divorce and custody of their child. On the same day there was filed in the lower court an entry of appearance signed and sworn to by appellant, in which she stated that she had no defense against appellee's suit for divorce, and that she understood that appellee was asking for custody of the child. Decree, granting appellee a divorce and custody of the child, was rendered by the lower court on December 21, 1944.

Thereafter, on February 15, 1945, appellant married Nick Pastor, a soldier with whom she became acquainted in September, 1944, in Tennessee; and on March 3, 1945, appellee also re-married.

Appellant's last husband remained in the army until December, 1945, and appellant then accompanied him to his home in California, where they have since resided.

On January 28, 1947, appellant filed in the lower court her petition, here under consideration, to modify the original decree, so as to award her the custody of the little girl.

At the hearing below 10 witnesses testified on behalf of appellant and 14 witnesses testified for appellee.

Most of the testimony of appellant's witnesses was directed to proof of the excellent reputation of appellant in her new home and a showing that Pastor, her second husband, was a good man and that they were able, financially and otherwise, to give the child a suitable home and proper care.

Among the witnesses for appellee were the mayor of Marianna, the sheriff of Lee county, the president, of a bank, school officials and several neighbors of appellee. These all testified to the sterling character of appellee and his second wife. The witnesses acquainted with the situation in appellee's present home agreed that the little girl was receiving the very best of care and training. It was shown, without contradiction, that appellee's present wife had made a determined and successful effort to win the affections of her little step-daughter.

Appellee testified that appellant left him without any sort of warning, that he took the little girl (then about five years old) from their home in the country to visit in the home of a friend in Marianna, with the understanding that appellant, who was planning a trip to town, would call for the child; that instead of doing this appellant, without even telling the child, boarded a train and went to Dyersburg, Tennessee, her former

home. He testified that he did not find out where his wife had gone for several days.

Appellant sought to explain her sudden departure by stating that appellee had been mistreating her and that she was sick and could no longer endure his conduct toward her. A physician who had attended her several times testified that she was not ill physically, but suffered from hysterics and "brainstorms."

No judge can ever approach consideration of a case of this kind without a realization that something more than human wisdom is needed to guide in its decision. For we are dealing here with the destiny of a helpless, innocent little child who has been thrown, without any fault whatever on her part, into the maelstrom of a bitter controversy between her parents. Courts could be spared many of these difficult decisions and the little victims of the tragedies which such cases reflect might be saved from the terrible experience of an all-out court battle between the father and mother—the two persons who should and do, to the normal child, represent all that is dearest in life—if these parents would only realize the blighting sorrow that a broken home brings into the lives of children of divorced persons. If these fathers and mothers really love their offspring as much as they profess to do when they litigate over their custody they would suffer much from each other rather than cause this unhappiness to their children.

In the case at bar it was shown that appellant virtually abandoned her little daughter and went away without letting either her hubsand or her child know of her departure. Having every reason to know that the decree would carry with it an order vesting custody of her child in appellee, she complacently facilitated the obtaining of divorce by appellee. She may have had what seemed to her sufficient reason for so doing. But the fact remains that she deliberately brought about the situation which she now seeks to undo.

One of the witnesses, a woman of great culture and evident refinement, detailed the patient, wise and kindly

manner in which this step-mother, who seemingly sensed with rare perception the great duty and responsibility which she had assumed, had, from the very beginning, dealt with her little step-daughter. This witness further testified that this step-mother was doing nothing whatever to prejudice the child against appellant.

A child may well be compared to a clinging plant—its love and affection naturally reaches out and winds itself around those with whom it is associated. For nearly three years appellant permitted others to minister to this child and perform for her the duties that are the precious privilege of a mother.

The paramount object in every case like this is so to order the custody as will be for the best interests of the child.

Mr. Justice RIDDICK said in the case of *Lipsey* v. *Battle,* 80 Ark. 287, 97 S. W. 49: "In questions of this kind concerning the custody of infants the main consideration that should influence the court is the best interest and well-being of the child." See, also, *Coulter* v. *Sypert,* 78 Ark. 193, 95 S. W. 457; *Washaw* v. *Gimble,* 50 Ark. 351, 7 S. W. 389.

When it is considered that modifying the former decree would entail an uprooting of the child's life and taking her 2,000 miles away from her father, who has ever been constantly with her and who, according to the evidence, is giving her an excellent home and proper care, we cannot say that the chancellor erred in his conclusion that the best interests of the child would be served by permitting her to remain with appellee.

The decree appealed from is affirmed.