## HEDMAN v. HEDMAN.

### No. 7400.

Supreme Court of North Dakota.

Jan. 15, 1954.

Daniel S. Letnes, Grand Forks, for appellant.

Degnan, Hager & McElroy, Grand Forks, for respondent.

GRIMSON, Judge.

This matter comes before this court on appeal from an order modifying a decree of divorce as to custody of children.

The testimony shows that the plaintiff and defendant were married September 19,

1943, when defendant was only 17 years old. At that time the plaintiff was working in the shipyards at Duluth. After the birth of the first boy they moved to Clearbrook, Minn. near where plaintiff's parents lived and where their second boy was born. In 1946 they moved to Petersburg, N. D., where the plaintiff operated a service station in connection with which the defendant operated a small cafe and sold bus tickets. The family lived in the station. During that time some difficulties and misunderstandings seem to have arisen between the parties. Each makes serious accusations against the other. In the evening of the 16th day of October, 1948, the defendant left Petersburg in company with another man who had borrowed plaintiff's truck for a trip to Larimore. The next morning this man notified the plaintiff where he would find his truck in Grand Forks, and the couple proceeded by bus to Peoria, Ill. At that time defendant's sister was staying with the plaintiff and defendant in Petersburg. Defendant left both boys with her husband and her sister and never returned. Within ten days plaintiff started an action for divorce. A judgment by default was entered on December 22, 1948, granting the plaintiff an absolute divorce from the defendant and the custody of their two minor boys, aged three and four years. On due notice defendant, on November 10, 1952, made a motion to the district court for its order to modify the decree of divorce and to grant her the immediate and permanent custody and control of said minor children. Several affidavits were submitted for and against the motion and oral testimony was taken. The court, after due consideration granted said motion and entered an order on March 23, 1953, modifying the original judgment by giving the defendant custody and control of the children during the school year and the father during the vacation period. From that order this appeal is perfected.

 The question of where to place the custody of the children of a broken home is one of the most difficult problems that comes before the courts. They are the innocent victims of the unfortunate circumstances in which the parents have become involved. They are usually not of an age where they can appreciate the situation nor decide what is best for themselves. The parents are prejudiced against each other. Therefore, that decision must be made by the court. The principal concern of the court must be what is best for the children. The interests of the parents can be considered only to the extent of how their interests bear on the question of what is best for the children. When, at the time of the divorce, custody of the children has been given to one of the parties, an application by the other for custody must be considered in the light of what has happened since the original decision; the attitude of the parties towards the children during that time and what, if any, changes there have been in the circumstances of the parties since the original order of custody was made. Keezer on Marriage and Divorce, 2d.Ed., p. 416, lays down the rule for modification of a decree as to custody as follows:

"Broadly stated, the controlling considerations are a change of circumstances, the conduct of the custodial party, the morals of the parents, their financial condition, the age of the children and the devotion of either parent to the best interests of the children."

In Sjol v. Sjol, 76 N.D. 336, 35 N.W.2d 797, this court held that in a divorce action the custody of the children of the marriage should be awarded "in accordance with the best interests of such children and such an award is subject to modification from time to time as the best interests of the children may require." See Rufer v. Rufer, 67 N.D. 67, 269 N.W. 741; Schlak v. Schlak, 51 N.D. 897, 201 N.W. 832; King v. King, 61 N.D. 422, 237 N.W. 854; see also In re Sidle, 31 N.D. 405, 154 N.W. 277; Garrett v. Burbage, 55 N.D. 926, 215 N.W. 479.

"The paramount consideration in determining to whom the custody of a child shall be awarded after a divorce is the wefare and best interests of the child. To that welfare the rights,

claims, and personal desires of the parents, and even the wishes of the child, if opposed to that object, must yield." 27 C.J.S., Divorce, § 309 p. 1170.

"The father is generally entitled to custody of his infant children. This results from his obligation to maintain, protect, and educate them. This right is, however, neither unlimited nor inalienable. It continues no longer than it is properly exercised; and whenever abused or whenever the parent has become unfit, by immoral or profligate habits, to have the management and instruction of the children, courts of appropriate jurisdiction have not hesitated to interfere to restrain the abuse or remove the subject of such abuse from the custody of the offending parent." 17 Am.Jur., Divorce and Separation, Sec. 673, p. 511.

The evidence discloses the following record of the parties since their separation.

Defendant claims that on going through Fosston, Minn., the day after she left she wrote her mother who lived near Shevlin, Minn., to get her boys. She claims further that soon after she got to Peoria she wrote to plaintiff telling him where she was and asking for custody of the boys. She claims she gave him a post office box number for use in writing to her. Plaintiff admits getting two letters from her but said she gave no specific address so that he could not answer. She claims to have written several times, and that she also wrote him in care of his mother. No further efforts seem to have been made by defendant in regard to her boys until late in 1951.

After she arrived in Peoria defendant worked in a dry-cleaning establishment for a year, then did some work as a waitress in a restaurant. Finally she bought a restaurant business which she was operating at the time of the trial claiming a net income of between $350 and $400 a month. On June 14, 1952, she married one Mr. Herbert Piercey, an electrician with the Caterpillar Tractor Company, making about $80 per week. They lived at the time of the trial in a three-room apartment in the City of Peoria.

The defendant, now Mrs. Piercey, claims that she first learned of the Hedman divorce when she read in a Bagley, Minn., paper of the plaintiff's remarriage in the summer of 1951. Then she says she immediately drove in her car to Minnesota to see her children. She found one of the boys with his grandmother, Mrs. Hedman, the other was away somewhere. She claims she began then to take steps to get her children back but that she had difficulty in finding where the judgment of divorce had been entered. Such efforts, however, culminated in these proceedings. She again visited in Minnesota and saw her boys at the Hedman farm in July, 1952, at which time she had their pictures taken and gave each of them a new swimming suit. She also claims to have sent them two suits of clothes at the time of their birthdays and that she had given them a couple of dollars and some toys. That is all the showing she has made as to her interest in those boys since she left on October 16, 1948.

The defendant is supported in her application by Mr. Piercey, her present husband. He testified as to his own occupation and earnings and that he is agreeable to having the boys given to his wife and willing to contribute to their support. Defendant's only other witness is a Mr. Chadwick who has been a boarder in her restaurant for the last year or so and has heard nothing against her. He testified also that the restaurant was first class and was patronized by reputable customers. One Leo Schwabacher makes affidavit in behalf of defendant that she "is of good, moral character and general fitness and that she is the Proprietor of a restaurant in the City of Peoria, Ill., and realizes a moderate profit from said business; * * * that Doris Piercey has the ability and means to take care of her two children, Carl Hedman and LeRoy Hedman; that she would be a fit person to have the care, custody and control of said children."

It thus appears that the defendant, Mrs. Piercey, for almost two years after she

left the plaintiff paid very little attention to her boys. She probably had no means then to do much for them but she could have shown more interest in them. During that time they were being kept by Mr. Hedman's parents on the farm near Clearbrook, Minn. Her own folks lived on a farm near Shevlin, Minn., some 18 miles from plaintiff's parents' residence and it appears that they and the Hedmans were friendly and that the Hedmans at least on one occasion took the boys for a visit with their maternal grandparents. There is no evidence, however, that Mrs. Piercey ever inquired of her parents or of her sister with whom she left the boys, as to what had become of them. Now upon her investigation she admits that they were being well taken care of by the grandmother. She does not complain on the treatment they are now receiving in plaintiff's home. She has never visited them there although the present Mrs. Hedman says she is welcome to do that. She has never talked with the plaintiff about their joint interest in the boys or sought the opportunity to do something for the boys to show her love and affection for them. She is pretty much of a stranger to them. While Mr. Piercey, her present husband, made a good impression on the trial judge, there is no testimony regarding his character and background except that he was born in Tennessee and served in World War II. There is no showing as to his interest in children nor that he could or would take the place of a father to those boys. They are now eight and nine years old and arriving at the age when a father's care and attention means so much to them. The defendant herself will not be able to give them her full attention and care. She says that she will hire extra help in the restaurant and be with the boys at all times that they are home from school but she will keep on running her restaurant. That necessarily will divide her time and attention.

After defendant left the plaintiff kept defendant's sister for a while to take care of the boys and then took them to his mother on a farm near Clearbrook, Minn. He sold out his business at Petersburg in February, 1949, Plaintiff then returned to his mother's home at Clearbrook, where the boys were staying, and helped with the farming operations until he left for St. Paul where he entered a barber school to learn that trade. Since he got his barber's license he has been employed as a barber in St. Paul, earning $55 to $60 per week.

On May 12, 1951, plaintiff again married. This time to a women who had divorced two husbands before and was the mother of three girls, aged nine, six and two years respectively. Shortly after that marriage the plaintiff took the boys to the home he and his new wife established in St. Paul and the boys have lived with them since. At first plaintiff lived with his family within the city. Then later he bought a new, two-bedroom residence, costing $4,000, in a new housing development at 3962 Stockdale Drive which is some seven miles out of the city limits where he at the time of the trial lived with his family. On this he owes a mortgage of $2,000 which he pays off at $30 per month. The new Mrs. Hedman is receiving $20 per week as support for her youngest girl from the child's father.

The present Mrs. Hedman supports her husband in his desire to keep his boys and promises to take care of them as well as she does her own girls.

The plaintiff and his present wife are corroborated by the affidavits of a neighbor of the Hedmans where they first lived in St. Paul, to the effect that the present Mrs. Hedman is an "upright and moral woman, is a good housekeeper, has a reputation for sobriety and is a good provider for the children * * * including her stepchildren * * *" that she "maintains a neat and clean home; attends church regularly and is a fit and proper person to assist the plaintiff with the care, maintenance, education and training of said minor children." Another neighbor of the Hedmans at their new home says that "The Hedmans' home is clean and well kept; that the children are kept clean and neat and are well clothed; that the children are well mannered and are considered above average in

deportment in and about the neighborhood.; * * * that the present wife of Roy V. Hedman appears to be very fond of the step-children * * *". 'A physician makes affidavit that Mr. Hedman has brought the children to him for regular checkups and examinations and that he "verily believes that they are receiving proper and adequate food. and clothing." A minister makes affidavit that they are regular attendants at church and that the children "appear to be clean and well trained." Mr. Hedman's employer makes affidavit that he is regular and dependable in his work and will continue as a steady employee of the shop. The trial judge says: "I am much impressed by plaintiff's wife who with children of her own was perfectly willing and seemed anxious to retain defendant's children in the family home and take care of them."

Just when the plaintiff took the boys to his parents' home is not shown but that apparently was before he sold out his business at Petersburg. After that he went to his mother's place and stayed there where the boys were until he went to St. Paul. After that he testified that he visited with his boys at his mother's place at Christmas and other holidays until he took them to his new home.

The evidence shows that the plaintiff, father of the boys, has done for them all he could since his first wife left him and that the boys have had satisfactory care during all of that time. His present wife is devoting all her time to taking care of the five children. In their present home the boys have formed new family ties and have the attention and love of the father— the parent they know. The boys' associations with the stepmother's daughters appear to be satisfactory. The fact that the home is located in a suburban settlement would tend to give them a better environment than a location within the crowded city. While it is a small home it is new and the boys are given their own room.

The evidence, however, does seem to indicate that the defendant, Mrs. Piercey and her husband now have a larger income than the plaintiff.. That evidence only goes as far as to show the income of Mr. and Mrs. Piercey at the present time. There is no showing as to the financial standing of her restaurant business—whether she owes anything on it and what her future prospects with regard to that business may be. Neither is there any showing at all about her husband, Mr. Piercey, as to his financial standing except for the $80 per week that he receives as salary. Their present three-room apartment in the heart of the city would not be a desirable home for the boys. Whether they have the means to buy another home as they say they will is not shown.

Even if the Pierceys are in better financial circumstances than the plaintiff and could furnish the boys a more elaborate home and surroundings that of itself is not sufficient to warrant a change of custody. The richness of the home does not make up for love and affection. There is no certainty that the boys would have in the new home the love and care they now enjoy in the more humble home of the father. It would seem that the certainty of love and care in the father's home outweighs the material considerations which might be furnished in a greater degree by the mother and her husband.

Under the circumstances it does not seem that tearing those boys out of their new home and from the one parent who has shown them care and attention, and placing them in an unknown home with a mother who left them when they were young and helpless and paid no attention to them for almost two years after she left, is for the best interests of the boys.

In Irvine v. Aust, Mo.App., 193 S.W.2d 336, 342, the court says:

"When a child is legally placed in a home where it receives good treatment and moral training, it should never be removed from that home except for the most cogent reasons. A change in conditions does not necessarily authorize change of custody. To authorize the change of custody, the change in con-

ditions must be such that the welfare of the child requires a change of custody, (Citing cases.)"

In Pastor v. Sharp, 212 Ark. 328, 205 S.W.2d 855, the court sustained the refusal to modify a divorce decree so as to change the custody of a seven year old daughter from father to mother after father and second wife had provided the child with excellent home and proper care for almost three years after mother abandoned the child.

In Leverich v. Leverich, 175 Or. 174, 152 P.2d 303, the plaintiff had procured a divorce from his wife who had left him to live with another man. He was awarded custody of their daughter, eight years old. Three years later, the divorced wife, who had remarried, sought a modification of the decree to give her custody of the child.

In the meantime the husband had remarried. His second wife was concededly a good woman and a good mother to her stepdaughter. The Oregon Supreme Court affirmed the denial of the application. See also Bornstine v. Bornstine, 21 Wash.2d 104, 150 P.2d 60; Smith v. Frates, 107 Wash. 13, 180 P. 880, 882; Johnson v. Johnson, 72 Cal.App.2d 721, 165 P.2d. 552.

The district court erred in granting a change of custody at this time. The order of the district court directing a change of custody of the boys of the parties is reversed and the case remanded to the district court with directions to deny the motion for a change of custody and reinstate the original judgment.

MORRIS, C. J., and CHRISTIANSON SATHRE and BURKE, JJ., concur.