WILSON *v.* WILSON.

5-1458                                310 S. W. 2d 500

Opinion delivered March 3, 1958.

*N. D. Edwards,* for appellant.

*Ralph W. Robinson,* for appellee.

CARLETON HARRIS, Chief Justice. This is a child custody case. The child, Lee Irene Wilson, age six, is the daughter of David Lee Wilson, Jr., and stepdaughter of Sara Marie Wilson, appellants herein. Wilson was divorced from his first wife, mother of the child, in August, 1952, and was given permanent custody of Lee at the time. In November of the same year, Wilson entered military service. While in service, his parents, David Lee Wilson and Bessie Wilson, appellees herein, kept Lee in their home.[1] Wilson, Jr., married his present wife in

---

[1] Appellees also kept Lee from March, 1952, until David Wilson, Jr.'s divorce in August.

March, 1955. In September, 1955, the younger Wilson and Sara Marie, his wife, established a home in Memphis, and took the child to such home. Upon being discharged from service, David Wilson, Jr., returned to Tulsa, Oklahoma, to reclaim his job with Douglas Aircraft Company. Appellants had the custody of the child from September, 1955, until May 30, 1957, when appellees brought her to their home in Crawford County for a visit. Appellants sought to take the child on May 31st, but were prohibited from doing so by the elder Wilsons. David, Jr., and Sara Marie filed their petition for writ of *habeas corpus* in the Crawford County Chancery Court, and the writ was issued on June 1, 1957. On June 3rd, the cause was heard, at the conclusion of which, appellants' petition was denied, and the court ordered: "* * * that the minor child, Lee Irene Wilson, be given into and remain in the custody of the defendant grandparents, David Lee Wilson, Sr., and Bessie Wilson, for a period of six months and until further orders of court * * * ." From such decree comes this appeal.

Child custody cases are always difficult to determine, and this one is no exception. First, let it be said that there is no proof in the record which reflects in any manner upon the morals or character of any of the litigants herein. The father has a good job, and is well able to take care of Lee, as are appellees. Both the father and appellees seem devoted to the child. There is evidence, however, that the child has not been properly cared for. The grandmother's testimony largely related to the physical condition and mental attitude of her granddaughter. Much of her evidence related to matters told her by the little girl, which, of course, was inadmissible. She stated, "The child was all on edge," and testified that Lee "looked to me like something out of a refugee camp. Concentration camp, I'll get it right. * * * She just looked starved. * * * Her little ribs sticking out. * * * " Pictures were exhibited showing the child as she was at the time of leaving the grandparents to go and live with her father and stepmother, and she appeared "plump" and healthy look-

ing. Mrs. Wilson, Sr., testified she had no intention of taking the baby away from the younger couple, but "just want her cared for." Her testimony was corroborated by the grandfather, who also stated that Lee had been taken to a baby specialist, and "the tests he made will be in the mail this morning," and that they were to give her vitamins. Seven neighbors testified. Excerpts from such testimony are as follows. Al Meadows testified he did not recognize the child when he saw her . . . "She looked awful poor and skinny to me," although she had been the picture of health when living with the elder Wilsons, approximately a year and a half earlier. Joel Mays, minister, testified that she had changed to an extent, during the year and a half, that he did not recognize her, though he had frequently seen her when she lived with the grandparents. Mrs. Lonnie Simmons: "Well, it seems to me that she looks awful bad." Virginia Mae Meadows testified that she had known Lee since the latter was a tiny baby. "She has lost an awful lot of weight. Q. Have you seen her body? A. Yes, sir, I did. Q. What condition is it in? A. Very poor, I think. Q. Are you able to count the little things ribs from the back? A. Yes, you are." Mrs. Juanita Rush also testified she had known the little girl since babyhood and had had occasion to see and observe her frequently. "I didn't know her when she came in the store Saturday afternoon." Mrs. Fred Howard . . . known her since she was a baby. "I have seven children of my own, and when I saw Lee yesterday, it nearly broke my heart, because she didn't look like the same little girl I used to know." Raymond Johnston: "A year and a half ago, she was a live-wire. She was dancing around like a normal kid. I have got a lawn down there that's about a four to one slope, and she'd run up and down it like a squirrel, but Sunday she was down there, and she couldn't hardly get up and down. It was pitiful."

Appellant, David Wilson, Jr., stated that the understanding between him and his mother when he took the child was that he and his present wife "could have her as long as she was treated right," and he testified that Marie treats Lee just like she does their other little girl,

born of the second marriage, and "There couldn't be a better wife and mother than she is." He stated that Lee was not punished in a manner that "would do her any harm in any way." The stepmother testified that she treated the child the same as her own, and that Lee had plenty to eat. She was critical of the meals given the child by the grandparents. "If she wanted sweets instead of a meal, she had it when she lived with them." To a charge made by the grandmother, that she had placed the child on bread and water, she stated that it was only for one meal and because Lee was suffering with dysentery. When asked if she had deprived the child of dessert for a week, she replied: "If she sneaked any—she has done it on occasions. Right after I punished her, she went without one day, without sneaking some dessert. Find some and try to get into it, and I would say, 'You don't get any tomorrow either.' " During cross examination she was asked: "Q. And she was a very plump child when she came to you? A. Yes, she was. Q. She is now very, very thin. Her ribs show. You can count each one of them separately. A. That is not due from not eating, sir. Q. I am not trying to diagnose it, but that is true? A. That's true, yes." She stated that Lee had "just recently gotten slim," but had not been taken to a doctor since school started in September (eight or nine months earlier); at that time she was found to be in good physical condition.

The court found:

"In 1955, the little girl was healthy, plump, and full of energy. 18 months later, while David, Jr., and his family lived in Tulsa, Okla., the little girl is * * * so thin that her ribs can be counted from her back, gave the appearance of being starved, * * * . Nine witnesses testified as to this (for the respondents). * * * This little six year old girl is thin, nervous, frail, weak . . . being whipped, reared strictly (apparently with no affection from stepmother) by stepmother while father is at work. * * * Under these circumstances, this court feels . . . after listening to seven disinterested witnesses . . . that the infant's welfare demands that the grandmother keep the little

girl here in Arkansas temporarily . . . for six months. At the end of six months we can have another hearing, and perhaps turn the child back to the father . . . * * * ."

Under the circumstances, we are unable to conclude that the action of the court, in taking the child from the father and stepmother for six months, was improper or erroneous. While we do not think it is within the province of this court, or any other court, to instruct parents how to rear their children . . . what they should eat . . . in what manner or how often they should be punished . . . we are of the opinion that a court has the right, as well as the duty, to safeguard the health and welfare of a child, though it should be well established that the health or welfare of the minor is actually in jeopardy. Our thinking in this matter is influenced to a great extent by the fact that the order is only temporary. Let it also be remembered that this is not a case wherein total strangers invoke the aid of the court, but rather grandparents, who have had the actual physical custody of the minor for the greater part of her life. It might also be pointed out that this is not a controversy between grandparents and natural parents, for here involved is a stepmother. The chancellor saw and heard the witnesses, and all the parties to the litigation, and evidently saw the child, as the testimony reflects she was present. We know of no type of case wherein the personal observations of the court mean more than in a child custody case. The trial judge had an opportunity that we do not have, i. e., to observe these litigants and determine from their manner, as well as their testimony, their apparent interest and affection, or lack of affection for the child. Under our oft repeated rule that we will not disturb the findings of the chancellor unless they are clearly against the preponderance of the evidence, we affirm this temporary order.

Subsequent thereto, appellants filed a motion for a new trial, alleging that prior to the hearing, they did not know Lee had been examined by Dr. Shearer, a child specialist, on May 31st, and that "* * * Dr. Shearer, if present and testifying, will testify that the defendants

brought the minor child to his office on Friday, May 31, and advised him that the stepmother of said child had been starving the said child and otherwise mistreating her and that the child had been known on occasions to eat food from garbage cans; that plaintiffs believe and therefore allege that Dr. Shearer will testify that he examined the minor child herein and that he found the child to be a normal child[2] for her age, that he found no evidence to indicate that she was suffering from malnutrition, that he found nothing in his examination which would indicate that the said child had not been properly fed and cared for or that she had not received the proper diet * * * ." The court refused to allow the affidavit to be filed, or to enter an order either allowing or disallowing the motion for a new trial, taking the view that the court had lost jurisdiction as of the time of the filing of the notice of appeal. Appellants contend that the court should have permitted the affidavit to be filed, considered by the court in ruling on the motion for new trial, and after consideration, should have granted same. The consideration of this contention is presently immaterial, since the order of custody was only entered for a period of six months. In its opinion, the court stated that it would hold another hearing at the end of that time, and such period has already passed. So actually, the question as to whether the court's order was proper is now moot, for under the order, another hearing will now be held. Undoubtedly, Dr. Shearer and any other witnesses with pertinent information will be given the opportunity to be heard.

Affirmed.

GEORGE ROSE SMITH, WARD and ROBINSON, JJ., dissent.

PAUL WARD, Associate Justice, dissenting. I feel so strongly that the majority is wrong and that it has perpetrated such a terrible injustice on a fine patriotic young father that it is difficult for me to calmly and dispassionately phrase this dissent. The only saving feature I can see about the opinion is that it cites no legal precedent,

---

[2] According to an accompanying affidavit by Dr. Shearer.

so there is hope it won't be used in the future to deprive some other person of his own flesh and blood.

The salient, undisputed, and almost unbelievable facts supporting the majority are these: David Wilson, Jr., secured a divorce from his first wife in 1952, and he was awarded the legal custody of his 2-year-old daughter, Lee Irene, who is the subject of this litigation. David was in the service of the United States Army overseas so he permitted his father and mother to take care of Lee Irene. When David returned from overseas in early 1955 he married his present wife with whom he has been living happily ever since. Six months later, after David returned from overseas the second time, he and his wife took Lee Irene to their home in Memphis. A few months later he, his wife, and Lee Irene moved to their present home in Tulsa, Oklahoma, where he had permanent employment with the Douglas Aircraft Company. There they lived in peace and happiness for nearly two years and until May 30, 1957, when they graciously and voluntarily took Lee Irene for a day's visit with her paternal grandparents in Crawford County, Arkansas. The next day when David and his wife went to pick up Lee Irene for the trip back to Tulsa, instead of getting her, David got a lick on the head and his wife got knocked to the floor.

Instead of David taking his little girl by force as many a person might have done under the same circumstances, he looked to the law of the land for redress, no doubt with confidence and assurance. He filed a petition for a writ of *habeas corpus* to obtain custody of his child. Appellees, strangely, filed no answer and no written petition for custody.

The ONLY reasons ever assigned by appellees for wanting to deprive David of his 7-year-old child was that she was not *being properly treated* [in her own father's home] and was not *being fed properly*. I realize this sounds ridiculous and unbelievable but it is the record.

I have carefully read the testimony to support the above alleged reasons for wanting to deprive David of the custody of his child and, in my opinion, it boils down to what is summarized below.

*As to Mistreatment.* The proof showing Lee Irene was not treated right in the home of her father was based entirely on what the 7-year-old child told her grandparents, and the majority properly say this evidence was not admissible. Unless I have been laboring under a gross misapprehension of the law during the forty years I have been practicing and trying to interpret it, that disposes of the charge of mistreatment.

*As to Not Being Fed Properly.* The testimony to substantiate this charge falls under three categories.

(a) Seven neighbors, who hadn't seen the child in two years or more and who had never been in David's home, said the girl was not as fat as she once was.

(b) Four pictures were introduced in evidence showing Lee Irene to be rather chubby when she lived with her grandparents. There are no pictures showing what she looks like now.

(c) Appellees testified to what the little girl had told them.

To offset the above, David and his wife both said they loved Lee Irene, that they wanted to raise her in their home, and that they and Lee Irene had plenty to eat. David testified his doctor examined Lee Irene before the trial and it was his opinion that there was nothing wrong with her. The father offered to show by another doctor that she was normal in respect to height and weight.

The only reason assigned by the majority for depriving David of his child was the rule "that we will not disturb the findings of the Chancellor unless they are clearly against the preponderance of the evidence." My answer to the application of this rule is that under such a process of reasoning the sacred ties of any family with small children are hereafter jeopardized in the jurisdiction of Arkansas. In fact no family in any state is safe any more if they permit one of their children to visit friends in Arkansas for only a day.

Giving the majority the benefit of the doubt, and assuming they meant to apply the oft used rule "for the best

interest of the child," still the opinion is legally indefensible. I have diligently searched our decisions dealing with this rule and find that it was never used independently as a criterion to determine custody. The rule is applicable only to tip the scale when the issue is otherwise in doubt. This is shown by our numerous decisions. See: *Kimberling* v. *Rogers,* 227 Ark. 221, 297 S. W. 2d 772; *Roberts* v. *Roberts,* 226 Ark. 194, 288 S. W. 2d 948; *Beavers* v. *Smith,* 223 Ark. 43, 264 S. W. 2d 617; *Self* v. *Self,* 222 Ark. 82, 257 S. W. 2d 281; *Cooke* v. *Gentry,* 220 Ark. 785, 249 S. W. 2d 848; *Sage* v. *Sage,* 219 Ark. 853, 245 S. W. 2d 398; *Vengas* v. *Mascorro,* 216 Ark. 173, 224 S. W. 2d 532; *Smith* v. *Smith,* 215 Ark. 862, 223 S. W. 2d 772; *Pastor* v. *Sharp,* 212 Ark. 328, 205 S. W. 2d 855; *Adams* v. *Adams,* 224 Ark. 550, 274 S. W. 2d 771; *Hydrick* v. *Hydrick,* 224 Ark. 712, 275 S. W. 2d 878; *Tidwell* v. *Tidwell,* 224 Ark. 819, 276 S. W. 2d 697; *Cushman* v. *Lone,* 224 Ark. 934, 277 S. W. 2d 72; *Harris* v. *Gillihan,* 226 Ark. 19, 287 S. W. 2d 569, and *Coder* v. *Coder,* 226 Ark. 478, 290 S. W. 2d 628.

In the case under consideration here the grandparents do not rely on any deep attachment they have formed for the child or the child for them, they do not even intimate that their son and his wife are not fitted morally or financially to have the custody of Lee Irene, and they do not pretend that she had been abandoned by her father and stepmother. They merely feel, as probably many grandparents do at times, that the child would be better off in their custody. I repeat, measured by the majority view, that every father [and mother] stands in jeopardy of losing his most sacred, God-given possession—his own children. The very thought of such a thing is so contrary to every enlightened concept of the laws of God and man that it is alarming to know this court would approve it.

The majority, perhaps with an unconscious sense of uneasiness, seemingly seek to lessen the blow to Lee Irene's father by pointing out they are only approving a temporary order of the Chancery Court. I call attention to this: The court gave the child to appellees for six months *and forever* unless it changes its order. That, no doubt, sounds pretty final to David. Moreover every order dealing with the custody of children is treated under the law

of this state as final, otherwise this appeal could not have been taken.