FRANCES MABRY ET AL *v.* DAN MABRY

5-4365                                         420 S. W. 2d 856

Opinion delivered November 27, 1967

*Francis T. Donovan,* for appellants.

*George Hartje Jr.,* for appellee.

CARLETON HARRIS, Chief Justice. This is a child custody case. On July 16, 1963, Daniel L. Mabry, appellee herein, was granted a divorce on a cross-complaint from his wife, Winona Mabry, and was given custody of the three minor children born to the parties, Danny Mabry Jr., Steven Mabry, and Ronald Mabry. In late 1966, the oldest boy, Danny, ran away from home, and went to live with his mother in Carterville, Illinois. In January, 1967, Mrs. Wilma Mabry, age 64, and mother of Daniel Mabry, and Frances Mabry, sister of Daniel, petitioned the court for custody of Steve and Ronnie,[1] asserting

---

[1] At the time of the hearing on this petition, Danny was 16 years of age, Steve, 13, and Ronnie, 4.

that their son and brother (appellee) had subjected the minor children to repeated and unnecessary whippings, these whippings occurring for ridiculous reasons, and they alleged that great mental damage was being done the children thereby. The petitioners, appellants herein, who live in Jacksonville, Florida, desired that the boys be removed from their present environment, and placed with appellants. Before this petition was heard, Steve also ran away from home and joined his mother and brother. Thereafter, the court conducted a hearing on the petition, and found that as between petitioners and the father, the latter was entitled to the custody of Ronnie.[2] From the decree so entered, appellants bring this appeal.

The two older boys testified[3] that their father would become angry, and whip them with a belt over the entire body. Each had a paper route, and each testified that if he were late getting back from the route, a whipping would be administered, and the same would occur if the boys were late from school. Danny testified that he earned about $40.00 per month on his route, and that his father and stepmother always took the money, leaving him only enough to pay for his lunch. He stated that his father hit him with his fist on one occasion after accusing him of taking drugs. Steven testified that appellee treated him and his brother all right until he remarried, but that after that his father would get very angry, make a "big thing" out of small matters, and

---

[2]The court also found: "As to the two older children, Danny, age 16, and Steve, age 13, no decision is made, and the petition is dismissed. This is done because the children are not in the State of Arkansas and are not in the custody of either petitioners or respondent. The proof shows that the children are now with their mother, Winona Mabry, in Carterville, Illinois. A decree of this court fixing custody between the parties to the present action would be meaningless because Winona Mabry is not a party, the children are not before the court, and in any event, the court of whatever state the children may be in at the time will determine the question of custody based upon conditions at the time of such determination."

[3]By deposition.

would whip them with his belt. "She [referring to step-mother] put him up to it, though." He also testified that the young boy, Ronnie, had been whipped with a belt.

Emma Lasiter, 88 years of age, and great grandmother of the Mabry children, testified that she had seen bruises on their bodies, including "the print of the whip on them." Mrs. Lasiter, on one occasion, called the sheriff to her home to view the boys; the officer stated that, as he remembered, there was a skinned place above the left eye on Steve, which the boy said had been placed there by the father.

Wilma Mabry, one of the appellants herein, lives in Jacksonville, Florida, where she is principal of Fairfield School. She testified that she earned about $10,-000.00 per year. Mrs. Mabry had no personal knowledge of what might have happened in the home, acquiring her information from Steve, who, according to the witness, was extremely nervous, upset, and unsure of himself, and she said he cried during the whole time he told her about the situation at home. Dr. Ann R. Poindexter, who specializes in pediatrics, and is employed at the Arkansas Children's Colony, testified as to the effect of home brutality on the mental and physical development of children. She had no personal knowledge of alleged events, expressing her opinion from having read the depositions. Frances Mabry, the other appellant, who lives in the home with her mother, Wilma, testified that she visited her brother (appellee) at his home, and on one occasion, heard him and his wife discussing the fact that Danny had bent his bicycle wheel. She said her brother started hollering at Danny, stating that the latter had taken the bicycle out and bent it on purpose. Miss Mabry said that she defended the boy, asserting that, in her opinion, the weight of the newspapers carried by Danny in the bicycle basket had bent the wheel.

"* * * So when I said that, Dan tore into me. Said for me to shut my face and go back where I came from,

that I had no right to be there. And started wagging his finger in my face and coming at me. And he had these big blaring eyes, had a sort of glassy look in his eyes. And then he started shoving me backwards three or four times pretty hard and I felt like he was trying to knock me down, although he didn't. And he more or less turned his temper, this tirade or whatever it was that he'd started on Danny, because I had defended Danny, and he turned it on me."

Mrs. Delma Turner, whose husband is the uncle of appellee's first wife, testified that the boys appeared to be emotionally disturbed when they would come to her home, and she said they had told her of their unhappiness. Mrs. Turner testified at length, but most of her testimony related to what had been told her by the younger boy, Steve. Here, again, the witness had no personal knowledge of what had happened in the home, having acquired her information from the boys.

Appellee testified that, as to the bicycle, he had told Danny three times during the week to get the bicycle fixed; on another occasion, an acquaintance advised that the oldest boy had thrown bricks at a horse, cutting a large gash in the animal's head. A neighbor complained that the boys were throwing rocks at children, and he had punished them for these, and similar offenses. The father testified that they were supposed to get up around 4:00 o'clock as a matter of preparing to go on their paper routes, but he discovered that on one occasion, they had already left the house at 2:00 A.M., and on another occasion, they were gone at 2:30. When he asked as to the reason, their reply was that they were "just riding around town. Just riding around, was all they said, on their bicycles." Mr. Mabry is vehicle dispatcher at the Little Rock Air Force Base, and he readily stated that he had used a belt on the two larger boys after they "got too big" to be spanked. He denied any brutal whippings, but did say that he accidentally hit Steve in the face, which was caused by the boy

squirming and trying to get away from him.⁴ As to the paper routes, he testified that he had whipped them for coming in an hour or an hour and a half late. He stated that he had spanked the youngest boy for such incidents as talking in church and playing in the commode. Mrs. Glenda Mabry, appellee's wife, testified that she loved the boys and that her husband always tried talking with them before inflicting any whipping. She said that at one time he whipped them for going inside the hospital and drinking cokes instead of coming straight home from their paper routes. She also mentioned that Mr. James Cox, the Gazette agent in Faulkner County, had come to the house on one occasion, because the boys had not shown up to deliver papers, and he thought they had overslept. As a matter of fact, they had already left, and on returning home, stated "they were riding around looking at some tractors or something." At another time, Cox came over about 4:30 looking for them, and again, around 5:15. She testified the boys gave no explanation of what they had been doing.

Mr. Cox testified that he had received "more than average" complaints about the boys delivering the papers late, and he added that they left their employment without ever giving any notice to him that they would not be back.

Appellants point out that this court has stated that the controlling consideration in all custody cases is the child's best interest and welfare. *Powell* v. *Woolfolk,* 233 Ark. 893, 349 S. W. 2d 657, and cases cited therein. We agree that appellants, in that respect, state the law correctly, but the difficulty in the present instance is in determining just what is for the best interest of the child.

The entire argument of appellants is based on the alleged brutality of the father toward the two older

---

⁴He said, however, that the mark on Steve observed by the sheriff was caused by the older brother (Danny) hitting Steve in the eye with a clothes hanger.

boys. Of course, no normal human being would condone unmerciful or brutal beatings of a minor, but on the other hand, we think unquestionably that a parent has the right to properly discipline his child. Those who testified to personal knowledge of brutality were the two older boys themselves, and the great grandmother. The other witnesses based their opinions largely on what they had been told by Danny and Steve. The boys expressed resentment over several matters, Danny stating that he would rather live with his mother because he received "better treatment * * *. She will let us have any money we make, and will let us go places, and she doesn't whip us all the time like he did. In fact, she's never whipped us." Steve testified that he preferred to live with his grandfather and stepgrandmother, Ron and Gerrie Mabry (who are not parties or witnesses in this case). "They treat me nice, but when I do something bad wrong, they don't whip me but they scold me. It is better than getting a whipping." There is nothing unusual in this testimony. Probably most teenage boys would prefer to keep their money or be "scolded" rather than whipped when they do something "bad wrong." The testimony of the great grandmother was to the effect that she had seen bruises and marks on the boys (which they said were caused by their father whipping them) but the testimony of the sheriff, who was called to the home by Mrs. Lasiter does not indicate that he was very concerned over her charge of brutal treatment. It does appear that the boys were, on some occasions mentioned in the testimony, due to be disciplined.

The strongest circumstance for appellants in this case is that the petition is filed by the mother (and sister) of appellee—and mothers normally "stand up" for their children. Still, there are instances of litigation between parents and their children, and when this happens, feelings become intense.

In *Wilson* v. *Wilson*, 228 Ark. 789, 310 S. W. 2d 500, we used language that is quite pertinent to this case:

"The chancellor saw and heard the witnesses, and all the parties to the litigation, and evidently saw the child, as the testimony reflects she was present. We know of no type of case wherein the personal observations of the court mean more than in a child custody case. The trial judge had an opportunity that we do not have, *i. e.,* to observe these litigants and determine from their manner, as well as their testimony, their apparent interest and affection, or lack of affection for the child."

In fact, that case was similar in another respect to the present litigation, in that the dispute over custody was between a father and a stepmother on one side, and grandparents on the other. We affirmed the Chancellor who awarded the child to the grandparents for a period of six months in one of the few instances where this has been done. However, the facts were vastly different, nine witnesses, seven of them disinterested, testifying that the child had not been taken care of, some stating that the little girl "looked starved * * * her little ribs sticking out," one testifying that she was so poor and skinny that he did not recognize her; the others testified to similar facts. In a four to three opinion, this court affirmed the Chancellor's action in giving the custody to the grandparents for six months, but we said:

"Our thinking in this matter is influenced to a great extent by the fact that the order is only temporary."

Of course, all things being equal, a parent has, and should have, paramount rights to the custody of his or her child.

In summary, we cannot say that the Chancellor's finding was clearly against the preponderance of the evidence, and we are unwilling to substitute our judgment for that of the trial court.

Affirmed.