Herbert R. HAWN, Jr. *v.* Betty S. HAWN

CA 82-320                                              648 S.W.2d 819

Court of Appeals of Arkansas
Opinion delivered March 30, 1983

*Dodds, Kidd, Ryan & Moore*, by: *Judson C. Kidd*, for appellant.

*Barron, Coleman & Barket, P.A.*, by: *Gary P. Barket*, for appellee.

Tom Glaze, Judge. In this appeal, the sole issue is whether the trial court erred in denying appellant visitation with his thirteen-year-old daughter. The trial court also denied visitation to the child's grandparents, who had intervened but chose not to appeal.

Herbert Hawn and Betty Hawn were divorced October 27, 1980. By temporary order on February 26, 1980, Betty was awarded custody of their daughter, Rita, and Herbert was granted visitation every other weekend. On March 19, 1980, the court modified its order and required Herbert's sister to be present continuously during visitation. On May 12, 1980, the court ordered that visitation cease, pending further orders of the court. On October 23, 1980, the parties signed a property settlement agreement which resolved all matters, including custody, visitation and support. On October 27, 1980, Herbert took an uncontested divorce, and the court approved and made the parties' agreement a part of its decree. The part of the decree relevant to the issue here is that the parties stipulated that the "court shall determine plaintiff's (Herbert's) visitation privileges with the minor child subsequent to this decree at the request of [his] attorney and without further hearings on the matter unless the court so orders." The decree further provided that the "defendant

(Betty) has agreed as a part of the consideration for the property settlement agreement not to seek child support and none is set by this court."

Prior to the divorce, Betty and Rita moved to Texas to live. One month after the divorce, Herbert filed a motion with the court requesting visitation with his daughter. On October 1, 1981, the paternal grandparents filed a motion to intervene, requesting that they be allowed visitation with their grandchild. On December 22, 1981, the Court heard testimony on the respective motions and denied visitation to Herbert and the grandparents.

At the hearing, the evidence was undisputed that Herbert previously had a drinking problem which led in part to the dissolution of the parties' marriage. Herbert's drinking also led to the court's earlier orders restricting and denying his visitation rights with Rita. But Herbert also testified that he had quit drinking, and other witnesses presented testimony in support of his claim of sobriety.

The chancellor appeared to believe Herbert's testimony, because the judge found that Herbert was an alcoholic, but "he (Herbert) amended that." However, the chancellor voiced reservations about the resumption of vistation because of events which had occurred before Herbert became a recovered alcoholic. The judge noted that the problems that arose during the period in which Herbert drank were the reasons Rita did not want to visit her father.

In his findings, the chancellor made no mention of the conflicting psychiatric testimony offered by the respective parties. For instance, Dr. B. Travis Tunnell's opinion was that the father's visitation would be detrimental to Rita, while Dr. Brad Williams opined that Herbert and the grandparents should have contact with her. Tunnell's testimony basically covered the family problems that existed before the parties' divorce. Among other things, he related that Rita had witnessed fights between her mother and father. He also observed that Rita had experienced nightmares and headaches which subsided after Herbert's visitation rights were terminated.

Except for Rita, Betty gave the only other testimony in support of terminating visitation. She testified that before the divorce Herbert had made Rita stand at attention as a disciplinary measure and had kept her up late working on a math problem. She conceded, however, that he never physically harmed their daughter. She further testified that Herbert took the time to play with Rita and had a good relationship with her. But since their move to Texas, Betty admitted that she had not encouraged Rita to visit her father. In fact, Betty testified that she had an unlisted telephone number which she would not give Herbert because she did not want him to contact Rita.

From our *de novo* review of the record, we find the evidence to be largely undisputed — excepting the opinions given by the parties and the psychiatrists on the ultimate visitation issue. The facts underlying those opinions are essentially the same. In sum, because of Herbert's drinking problem and fights with his wife, his visitation rights were eventually terminated by the court. Since the divorce, no violence has occurred between the parties, and Herbert has quit drinking. At least, he had experienced ten months of sobriety immediately prior to the December 22 trial. Rita had evidenced her love for her father before and after her parents divorced, but her desire to reestablish a relationship has waned since her move to Texas. She presently expresses an unwillingness to visit her father or grandparents.

Because the chancellor terminated all visitation rights in this case, we have made every effort to fairly summarize (and detail where necessary) all the relevant facts, especially those which serve to support the court's decision. From our review of the Arkansas appellate cases on the subject, the Supreme Court has on only one occasion affirmed a trial court's denial of a parent's visitation rights. *Lumpkin* v. *Gregory*, 262 Ark. 561, 559 S.W.2d 151 (1977). In *Lumpkin*, the Supreme Court found the father forfeited his rights because he (1) made no support payments; (2) refused to bring his son home after visits, and he beat up appellee when she went to pick up the child; (3) took the child to a pool hall; and (4) exposed himself to appellee's teenage sister during his marriage to appellee. Most of the father's acts in

*Lumpkin* occurred after the parties' divorce, and the acts were flagrant violations of the rights of the child and his mother. Even so, the Supreme Court left the father's right to visitation open upon a future showing of changed circumstances.

Except for the *Lumpkin* decision, the Supreme Court and this Court have decided cases in which the termination of visitation was sought on appeal or ordered by the trial court; in each instance, the courts have upheld the parent's right to visitation. *Welch* v. *Welch,* 5 Ark. App. 289, 635 S.W.2d 303 (1982) (Court reversed denial of visitation to mother during summer months when father had custody of child); *Lewis* v. *Lewis,* 260 Ark. 691, 543 S.W.2d 222 (1976) (Court reversed trial court's denial of visitation to father who espoused religion to child and the mother); *McCourtney* v. *McCourtney,* 205 Ark. 111, 168 S.W.2d 200 (1943) (Court reversed trial court's order granting father visitation upon written permission of mother); *Lockhart* v. *Lockhart,* 143 Ark. 276, 220 S.W. 44 (1920) (Court reversed the trial court's denial of visitation to the mother whom father had divorced on grounds of adultery); *DeReitmatter* v. *DeReitmatter,* 75 Ark. 193, 87 S.W. 118 (1905) (Court affirmed decree awarding custody to mother because father was cruel and a drunk — even so, it upheld the court's order permitting the father visitation after a showing that he had quit drinking); and *Haley* v. *Haley,* 44 Ark. 429 (1884) (Court affirmed visitation given to mother charged with immorality).

Undoubtedly, there are cases in which circumstances warrant the termination of a parent's visitation rights. However, such action is a drastic one which our trial courts have cautiously employed and which our appellate courts have critically reviewed.

In the instant case, the chancellor's decision to end Herbert's visitation rights during the pendency of the parties' divorce is not questioned. Following the divorce, however, Herbert has evidenced no violence toward Betty, and he had stopped drinking for ten months. Herbert appears to have resolved the two main problems that led to his divorce from Betty and severance from his daughter. Any

other circumstances that might impede his efforts to be with Rita are matters over which he has no control. For example, Betty's negative attitude toward Herbert and his relationship (or lack thereof) with Rita have only grown worse since the divorce; the same can be said for Rita's perspective of her father. Presented with these circumstances, we perceive no steps that Herbert might take to regain his rights to see his child. For this reason, we are compelled to reverse the chancellor's decision on the evidence as it existed on December 22.

In reversing, we recognize the conundrum in which the chancellor found himself when faced with a thirteen-year-old child who unequivocally stated she does not want to visit her father. Too, we recognize the chancellor's concern over the father's past conduct and its effect on the child. However, we are encouraged by the fact that Rita expressed that she loved her father and recanted that love only after having no contact with him for two years. The father expresses his love for his daughter and ostensibly has taken the necessary steps to, once again, establish a relationship with her. We also find solace in the testimony of Dr. Williams, who recommended that Rita have contact with her father. consistent with Dr. Williams' testimony, Dr. Tunnell told the chancellor that severed relations [between a parent and child] are better healed than left severed even if the child is unwilling. Prior to this opinion, Tunnell had expressed his belief that Rita should have no contact with her father. His belief, however, was based on the misconception that appellee *willingly* had no contact with his daughter for eighteen months — a factor he indicated caused Rita to believe her father did not want to see her. Tunnell stated this lack of contact by the appellant evidenced no love and affection. However, on cross-examination, Tunnell said that he was unaware that the child's telephone number was never given the father. In fact, as noted earlier, Rita's mother had an unlisted number because she did not want appellant to have any telephone contact with his daughter. In sum, appellant was given no visitation privileges by the court nor was it possible for him to call his daughter.

Obviously, circumstances can and do change. Accordingly, we will not assume what has occurred, if anything,

between the parties since the December 22 hearing. There-fore, we make no attempt to set the time and manner of visitation in this appeal but rather remand this cause for the chancellor to do so.

Reversed and remanded.

CRACRAFT, J., dissents.

GEORGE K. CRACRAFT, Judge, dissenting. I respectfully dissent for many of the reasons I gave in *James Earl Taylor* v. *Sadie Coreen Taylor*, 8 Ark. App. 6, 648 S.W.2d 505 (1983). My dissent here is a much stronger one because I feel that the majority has completely reversed the order of all those considerations our courts have heretofore very wisely followed in child custody matters. We have consistently held that the polestar in determining child custody cases should be a determination of where the best interest of the child lies. Here we seem to be saying the desire of the parent is paramount to a child's best interest and welfare. The rule is, and it has always been, that even though a divorced parent's right to visitation with a child is a well guarded one, there are situations in which that right can be forfeited. *Lumpkin* v. *Gregory*, 262 Ark. 561, 559 S.W.2d 151 (1977). In this case on evidence which even the majority does not say is clearly erroneous, as defined in Rule 52 (a), Arkansas Rules of Civil Procedure, the chancellor has found that the best interest of the child would not be served by visitation with the appellant at this time. The majority seems to be saying that just because there is nothing further the appellant can do to see his child we should reverse that finding of the chancellor and give him that right.

I feel that the majority has also inverted the usual role of chancery and appellate courts in such matters. It has long been our rule that appellate courts defer to the superior position of the chancellor in weighing and assessing the evidence presented to him. Our courts have often declared that there is no type of case in which the personal observations of the chancellor mean more than those involving child visitation. *Lumpkin* v. *Gregory, supra; Wilson* v. *Wilson*, 228 Ark. 789, 310 S.W.2d 500 (1958). These consid-

erations are even more important where, as here, the same chancellor has had the parties before him on the same subject matter on at least three prior occasions. He had the advantage of nearly three years' experience in dealing with these parties and their problems and has personally observed the child on those occasions. He has had the same experts before him on a prior occasion.

I do not mean to imply that there are no circumstances under which this father might reestablish a relationship with his child. It is my opinion, however, that the chancellor was in a superior position to determine that the time was not yet here and that forced visitation would not serve the interest of the child. If for one moment I felt that the chancellor had abused his discretion or acted arbitrarily I would be writing a concurring opinion much stronger than the opinion of the majority here. The majority does not say that he acted arbitrarily; they simply determine from a written record that they would reach a different conclusion. They conclude that as appellant had recanted his infliction of emotional wounds upon this child those scars will now simply go away and disappear. They are in my opinion substituting their judgment for that of the chancellor without the benefit of his observations and experience.

Nor can I believe that the majority have summarized or fully considered that testimony on which the chancellor's finding was so obviously mandated. On July 2, 1980 (prior to the entry of the final decree but after visitation had been temporarily terminated) the court held a hearing on the issue of visitation by the appellant. Dr. Williams, in whose testimony the majority found solace, testified on behalf of the father at that hearing. Eighteen months later he again testified for the father at the hearing now under consideration. Although he had not seen the child in the intervening eighteen months he testified in chief to the same opinion he had given previously. He was afforded a one hour visit with the child during the course of the trial and on recall adhered to his former recommendation that the child have contact with her father.

Dr. Travis Tunnell had also testified in this July 2nd hearing. He had seen the child at least five times during the intervening eighteen month period. He testified that visitation would have harmful effects on the child based upon emotional problems which he found to have already developed in her formative years and which were aggravated during the period of restricted visitation. He testified that in July 1981 she was having nightmares and headaches as a result of her fear of him. He further testified that since visitation had been terminated these problems subsided. He testified: "It is my professional opinion that she should continue where she is with her mother being the primary parent and that visitation would be detrimental to her." His testing of her indicated that there was underlying anxiety which could cause some real psychological problems. His testimony abstracted continued:

> 1.) She is twelve years of age now. I think most studies have shown that bonding between parent and child occurs between the age of four and seven, somewhere in that range, Mr. Barket, and I don't feel in terms of your question that this would erase her image of her father even if he said that he had not had anything to drink for ten months and that he was receiving counseling. It is not enough to come in and say I have quit drinking and I'm going to counseling to reestablish bonds or show love and affection toward a minor child. His lack of contact in the last eighteen months does not show love and affection in my opinion. It is my opinion that it's not in the best interest of the child to have contact with her father or to have continued visitation.

What the chancellor found is that irrespective of appellant's present condition and attitude, his past conduct during the child's formative years has created wounds and scars which will not be erased by his recanting and that forced visitation at this time would merely aggravate them.

It is my conclusion that in seeking justice for the father in this case the court is inflicting a manifest injustice upon this child. I will adhere to the rule that her best interest, rather than his, is what both the chancellor and this court

should seek. In my opinion when we attempt to substitute our judgment for that of the chancellor in these circumstances we are playing with dynamite.