Jimmy HEPP *v.* Debbie Lee HEPP (Byrum)

CA 97-1082                                        968 S.W.2d 62

Court of Appeals of Arkansas
Divisions II and III
Opinion delivered April 15, 1998

*John Bynum*, for appellant.

*Doug Skelton*, for appellee.

JUDITH ROGERS, Judge. Appealing from an order denying his motion for a change of custody, appellant contends that the chancellor's decision is clearly against the preponderance of the evidence. We disagree and affirm.

Appellant, Jimmy Hepp, and appellee Debbie Byrum, were divorced in September of 1991 when their daughter, Cassandra, was twenty months old. Custody of the child was contested, and the court placed her in the care of appellee. Appellant later petitioned for a change of custody. By order of December 11, 1995, the chancellor denied that petition. The order provided, however, that a change of custody would be forthcoming if appellee associated with or had the child in the presence of a man named Johnny Lee Boggs. The appellant filed another petition for a change of custody in March of 1997. As grounds for this motion, appellant alleged that appellee had constantly been with Mr. Boggs, that she

was drinking excessively, and that she was failing to properly care for the child. After a hearing on May 28, 1997, the chancellor denied the motion. This appeal followed.

In deciding this case, we are guided by the following principles. As in all custody cases, the primary consideration is the welfare and best interest of the child involved; all other considerations are secondary. *Fitzpatrick v. Fitzpatrick*, 29 Ark. App. 38, 776 S.W.2d 836 (1989). It is well settled that, although this court reviews chancery cases *de novo* on the record, the chancellor's findings will not be disturbed unless clearly against the preponderance of the evidence. *Bennett v. Hollowell*, 31 Ark. App. 209, 792 S.W.2d 338 (1990). Since the question of the preponderance of the evidence turns largely on the credibility of the witnesses, the appellate court defers to the superior position of the chancellor, especially so in those cases involving custody. *Stone v. Steed*, 54 Ark. App. 11, 923 S.W.2d 282 (1996). Repeatedly our courts have recognized that there are no cases in which the superior position, ability, and unique opportunity to view the parties carry as great a weight as those involving minor children. *Norwood v. Robinson*, 315 Ark. 255, 866 S.W.2d 398 (1993).

The first witness called by appellant was Rigmor Mereness, appellee's supervisor at the health department in Russellville. She testified that appellee worked for $5 an hour as a health-care aide who provides services to persons in their homes. She said that appellee had a good record of service and that she had heard of no complaints having been registered against her by her clients. She stated that appellee had asked for additional hours of work but that none were available.

The child, Cassandra, age seven and in the first grade, responded to questioning as follows. She said that she lives in a trailer with her mother and that she likes it. She testified that she sleeps with her mother and that she sleeps on a pallet on the floor when her mother is sick. Cassandra said that her Aunt Joyce had lived in the trailer for three weeks and that her half-sister, Nakita, also lived there. She said that her mother gets her up in the mornings for school and that she would either eat breakfast at home or at school. She said that she usually ate breakfast at school because

her mother gets up too early. Cassandra testified that she preferred to live with her father in that she felt safer with him because he does not leave her alone like her mother does. She said that her mother drinks beer once a week. She stated that being drunk means acting screwed up or weird and said that her mother did not get drunk every week, but that she was once drunk for two weeks. She said that she stays away from her mother when she is drinking because her mother might get rowdy. She also said that her mother has friends over when she is drinking and that they fight. She said that her mother fought with Nakita's dad and Brent, but she corrected herself to say that Brent was Nakita's father. When asked about Uncle Terry being one of those friends, she had no response. When prompted, Cassandra said that she liked it when Uncle Terry came over but that she was scared when he drinks. She testified that marijuana was something that you smoke and that her mother smokes marijuana in front of her. She said that her mother had done that only one time, that she had never done it recently, and that her mother had smoked marijuana two weeks ago. She testified that her mother rolled it up in a little box of paper, licked it, and used "plier things" to smoke it. Cassandra was asked to demonstrate this process for the chancellor but the record does not reflect what the demonstration entailed. She said that her mother acts strange when she smokes marijuana. She said that she is never scared when she is with her father and that she sees him one time a week. She said that she had seen her mother so drunk that she could not stand up and that it scared her. She said that her father helps her with her homework and that he gives her $2 when she makes good grades. She said that she sleeps in her own bed when she is with her father. She said that her father picks her up from school, that he buys clothes for her a lot, and that she goes to him when she needs something. She stated that she spends the night sometimes with her mother's boyfriend, Thomas, who lives in a shed. She said that she sleeps on a pallet when he and her mother are together and that they drink and smoke marijuana.

On cross-examination, Cassandra testified that the only reason she could think of for wanting to live with her father was because he makes her feel safe because he does not leave her alone.

She said that her mother leaves her alone for three or four minutes when she goes to the grocery store. She said that her mother tells her and Nakita to lock the door and stay inside while she is gone. She said that her mother had not left her alone any other time. She related that she spends one day a week with her father, on Sundays, and that she spends weekends at her grandparent's home. She said that her father had worked at Tile Stiles for twelve years and that she had seen Johnny Boggs there, who had come to see her grandfather. She said that Boggs was a friend of her father's family now and that she likes him. She further testified that she had seen Boggs beat her mother and that she had seen her grandfather pay him money one or two times, but that he did not work at Tile Stiles. She said she was excited about her father's apartment that he had had for one day, and she agreed that it had a nice swimming pool. Cassandra testified that after school she had playtime, cartoontime, then bathtime and bedtime. She said that her mother had snacks for her after school and that her mother either cooked every night or got something for dinner, like pizza. She said that she makes good grades in school, all A's. She testified that her sister had a bedroom in the trailer and that she had a room of her own that was now a playroom. She said that she does not sleep there because it is full of toys. She also said that she slept with her grandmother on weekends. She said that there was another bedroom but that it had all of her grandmother's "grave stuff" in it, saying that it had belonged to an uncle who had died when she was three years old. She testified that she had seen her mother drunk one time since they had moved into the trailer and that her mother had once been drunk for two weeks. She said that her father helped her with her homework but that he did not come over on school nights. She said he helped her with her spelling words on Sundays. She said that her father picks her up from school every Friday, but that sometimes her grandparents picked her up. She said that her grandmother had been picking her up for a long time and that her father had picked her up three times.

On redirect examination, she testified that she had seen Mr. Boggs three times at the tile business and that she had seen her mother drinking not many times, or three or four times.

Johnny Lee Boggs then testified on behalf of the appellant. Boggs stated that he was disabled from a back injury that had resulted from a car accident in 1975 and that he had been receiving disability benefits since July of 1996. He testified that he had met appellee in 1991, that they had dated and had once been engaged. He said that he was aware of the December 1995 order which forbade him from associating with appellee. He testified that appellee did not stay away from him. He said that they began seeing each other on the sly in February of 1996 and that their relationship continued until April of 1997. He said that appellee had been drinking consistently since 1991, that she drank most every weekend that they were together, and that, as far as he knew, she did not attend AA meetings. Boggs testified that he took his ring back from appellee in April because of an incident that had occurred on March 6. He said that appellee came to his home that Thursday, got drunk, and remained that way for two and a half days. Boggs stated that appellee was so drunk that night that she could not speak and that he was afraid that she might die. He said that he tried to get her to check on the children and that he finally got her to do so at around 11:30 that night. He drove her to the trailer, and they found that the children were not there. He said that she left his house on Saturday and that Cassandra was with her grandparents over the weekend, while Nakita stayed with appellee's sister. Boggs further testified that appellee would visit him during the week and would sometimes get off work by telling her employer that one of the children was sick. He said that appellee fought once with Brent Keeling who was staying with her because none of his family would have him. Boggs stated that appellee felt that the child's homework was part of the teacher's job.

When cross-examined, Boggs said that he did not work at Tile Stiles and denied having been paid for his testimony. He said that he had no idea what the previous custody hearing was about, and he said that he did not remember beating appellee in front of the child. He testified that he did not know what the previous court order said. Boggs denied that he had tried to get appellee to come back to him or that he had asked a preacher to speak to appellee about it because he was contemplating suicide. He testi-

fied that he drank alcohol off and on, that he was not a heroin addict, but that he was a convicted felon. He said that he had not seen Cassandra since December of 1995, but then he said that he had seen her by accident at the appellant's shop where he had gone to check on the price of tile and the cost of laying it. He denied having followed appellee's fiance around and said that he had left notes on appellee's door because she did not have a phone.

Appellant testified that he had been living at the Shadow Lakes Apartments for a month and that before that he had been living with his grandmother and uncle in Casa, Arkansas. He explained that his grandmother was older and needed help and that he and his uncle got groceries for her and took her to doctor's appointments. He said that he was self-employed and owned a business called Tile Stiles with his parents and brothers and that they had been in business for twelve years. He works eight to ten, or twelve hours a day, four to six days a week. Appellant testified that appellee had agreed to let Cassandra visit nearly every weekend, rather than every other weekend as provided in the latest order, and that he usually has her more than the six-week period ordered in the summer. He said that appellee sees Cassandra three or four times during the summer. He testified that, because of his work schedule, his mother picks Cassandra up from school on Fridays and that he sometimes allows her to spend Friday evenings with his parents, picking her up on Saturday after work. He said that appellee had reduced his visitation to every other weekend since the filing of his motion for a change of custody and that appellee had instructed Cassandra's teachers to refuse him access to the child. Appellant testified that he and Cassandra watch videos, play video games or fish on the weekends. He helps her with her homework and checks on her progress at school. Appellant stated that Cassandra was intelligent but that he had learned that she was doing poorly in spelling and that with his help her grade had improved. As a reward for good grades, he gives her money or treats her to pizza. He said that he paid child support and provided health insurance for Cassandra and that he buys her school clothes and gifts at Christmas and on her birthday. Appellant testified that he filed the petition because he can take better care of

Cassandra. He said that appellee had problems with alcohol and substance abuse and that she was sick and needed help. He added that he would approve of appellee having liberal visitation and that he would not keep the child from her.

Appellant denied on cross-examination that he had been accused of fondling a minor child, but he also stated that he had been accused of molesting his step-daughter. He said that the allegation was not true, and he denied telling appellee that it was. He testified that his first wife was fourteen years old when they married, while he was age twenty-four. He said that he had joined the military as a young man and had received a dishonorable discharge. He testified that he had been arrested in 1990 for being absent from the reserves without leave and that he had spent some time in the brig. He admitted that he had pulled a gun on a police officer when he was in high school. Appellant further testified that he had once hit appellee during the marriage, but that he had done so only after she had struck him four times. He said that he did not ask appellee to get an abortion and denied that he had beaten her when she refused. Appellant agreed that one could say that he ran out and got the apartment for purposes of the hearing, and he said that he had told Cassandra about the apartment and the swimming pool after he rented it. He said that he has picked the child up once for visitation since 1995 and that he had never been the one to return her to appellee. He stated that the child spends quite a bit of time with his parents. Appellant thought that appellee allowed more visitation to both foster good relations and to be able to do things on the weekends. Appellant was shown photographs taken by appellee of his parents' home. Although appellant has failed to include these photographs in his abstract, they reveal a yard that is overgrown with weeds and brush with old vehicles, appliances, and trash scattered about. The photographs of the interior show a home that is filthy and in utter disarray. Appellant testified that the photos were a fair representation of the outside of the house, but he said that the inside was not normally that messy.

In her testimony, appellee stated that she had been an admitted alcoholic since 1990. She said that she rarely has a problem with it because she stays with AA pretty strictly, attending meet-

ings once or twice a week. She admitted that she had one relapse in March of 1997. She testified that she was driving to work when the clutch on her car went out and that she went to Boggs's home because it was nearby. She said that he was drinking and that she started drinking. She explained that she was upset because she had recently spent a lot of money having her car repaired. Appellee testified that she does not remember much about that day after twelve or one o'clock in the afternoon, saying that she blacks out when she drinks. She said that she spent the next day recuperating because drinking makes her very sick. She stated that she contacted her sister on Friday to see if her fiance, Thomas Johnston, was angry and to make sure that the children had gotten off to school. Appellee testified that she knew that the children would be cared for by Johnston because he had planned to come over that Thursday afternoon. She said that she and Johnston had been dating since December of 1995 and that they had become engaged in December of 1996. With regard to Boggs, she stated that he contacted her after December of 1995 because he needed a witness for his disability case since his family would not help him. She went with him to Little Rock to consult with an attorney and attended the disability hearing. She said that Boggs had always worked and was unfamiliar with the benefits he could draw and that she helped him obtain food stamps. She said that she was afraid of Boggs and did not want to make him mad because in the past he had been physically violent with her, had threatened to kill her, had held knives to her throat, and had vandalized her apartment and damaged her car. She said that she was familiar with the previous court order and thought that it meant that Boggs was to have no contact with Cassandra since the Hepp family had alleged that Boggs had beaten the child. Appellee further testified that she lived in a three-bedroom, two-bath mobile home with her two children. She said that Cassandra had a bedroom but that Cassandra insists on sleeping with her because she is afraid to sleep alone. She said that the child does not sleep on the floor. She testified that the children get home from school at 3:30 p.m. and that they play, eat supper, do their homework, take a bath and then go to bed. She said that they were occasionally left alone in the afternoon if she works until 3:00 or 3:30 p.m. and that she has instructed them to stay inside with the doors locked.

She said that the children might also be left alone when she goes to the market three miles away. Appellee stated that, in addition to her income from work, she receives food stamps and draws a social security check for Nakita on account of her father's disability. She said that she had no trouble paying her bills or providing food and clothing for the children. Appellee testified that appellant would not make a good parent because he has never been responsible. She said that appellant had not wanted the child and had told her to get an abortion to correct his mistake. She said that whenever she sees the child or calls during appellant's visitation that she is with his parents. She stated that appellant had never picked up or returned the child from visitation before filing the petition, but that he had since done so two weeks ago and when the child left for summer visitation.

When she was examined by appellant's counsel, appellee stated that her sister-in-law Joyce was an alcoholic but she denied that Joyce was living with her. She testified that Brent Keeling, Nakita's father, had mental problems and that he had stayed with them over the Christmas holidays and for several weeks in the summer. She denied that she smoked marijuana and said that she had drunk alcohol only that one time in March. She said that she had gone to Boggs's home, despite her fear of him, because it was close and she had no car phone. She also admitted that in her deposition she had refused to provide the names of AA members so as to verify her attendance. She said that it was against the rules to divulge the identity of other members, including her sponsor. She testified that she had not taken Cassandra to the doctor since early 1994, but she acknowledged that the child had been sent home from school since then with enlarged tonsils. She testified that it had been discovered that the child had enlarged tonsils during an examination after a car accident, and that on the day in question Cassandra had no fever and was not complaining of a sore throat. Appellee testified that she worked twenty to twenty-five hours a week, that she had approximately $786 a month to spend, and that she saw no reason to work any harder or earn more money. She does not have a telephone, but she said that she had access to a neighbor's phone in case of emergency. Appellee testified that her fiance lived in an efficiency-type apartment and

admitted that she and the children had spent several nights there. She also admitted that she had entered the Hepp's home to take the photographs that had been introduced during appellant's testimony, but she testified that the door had been open and that she had always been permitted access to the home to use the telephone.

In his testimony, Thomas Johnston, appellee's fiance, recalled the night that appellee became intoxicated. He said that it was their arrangement for him to come over every day after work and that he arrived that day at 4:00 p.m. The children were watching cartoons, and he stayed fifteen to twenty minutes before going to the home of appellee's sister. He returned to the trailer because appellee was not at her sister's and talked with a neighbor until 7:30 p.m. He took the girls to Sonic for dinner and to his home for the night, where they watched a movie, bathed, and went to bed. Johnston testified that he had been dating appellee since December of 1995 and had become engaged to her a year later. Their wedding was scheduled in June. He said that he had never seen appellee drunk and that what occurred in March had never happened again. Johnston said that appellee was a good mother. He testified that she helps them with their homework, that they always have family time, and that the children bathe and go to bed at the same time every night. He said that he had never spent the night in the trailer while the children were present, but that appellee and the children had spent several nights at his home.

After hearing the testimony, the chancellor ruled as follows:

> Well, gentlemen, since I'm obviously familiar with this case, since the 28th day of March of 1991, I have had several hearings in this matter. I'm going to find that there is an insufficient change of circumstances to change the custody in this case. And I might add that with the exception of the child's testimony, who I don't believe has testified before, there was absolutely no change in the testimony. It's essentially the same that I've heard for at least two times.

It is the appellant's argument on appeal that appellee is an unfit mother based on testimony revealing that she has abused alcohol and marijuana and that she acted irresponsibly during the admitted drinking binge in March of 1997. Appellant contends

that the child's testimony describing appellee's actions was more credible than that of appellee, who was lying and not a person to be believed. We find no merit in this argument.

The chancellor in this case was well acquainted with the parties after having presided over two previous hearings concerning custody of the child. It is clear from the record that appellee's alcoholism was not a new development in the case. Despite appellant's argument, the chancellor was in a better position to gauge the worth of appellee's testimony, and he was entitled to believe her testimony that what occurred in March of 1997 was an isolated incident, that she was not presently drinking, and that she was receiving help and support for her problem by regular attendance at AA meetings. The chancellor was also entitled to believe appellee's denial that she used marijuana. Thus, the chancellor could find that the child was not at risk in appellee's custody. In making that determination, the chancellor could also consider the testimony that the child was well cared for and was doing well in school, and he could conclude that the child had suffered no ill-effects from being in appellee's custody for over five years. Also, while a child's preference is certainly to be considered, it is not binding on the court. *Marler v. Binkley*, 29 Ark. App. 73, 715 S.W.2d 218 (1989). Here, the testimony of the seven-year-old child was for the most part the result of leading questions and was laden with inconsistencies. We note that appellee argued with some force at the hearing that the child's testimony was influenced by appellant and his parents. We thus cannot fault the chancellor for not giving her testimony a full measure of credence. We must also observe that appellant's character was not without blemish and that there was some suggestion in the record that the child has spent more time with his parents than she has with him during visitation. Nevertheless, the grandparents did not testify at the hearing, even though they had filed a motion to intervene seeking their own visitation with the child. The chancellor denied that petition.

This court has stated numerous times that a material change in circumstances affecting the best interests of the child must be shown before a court may modify an order regarding child custody, and the party seeking modification has the burden

of showing such a change in circumstances. *Harrington v. Harrington*, 55 Ark. App. 22, 928 S.W.2d 806 (1996); *Fitzpatrick v. Fitzpatrick, supra.* Our reasons for requiring more stringent standards for modification than for initial determinations of custody are to promote stability and continuity in the life of a child, and to discourage repeated litigation of the same issues. *Jones v. Jones*, 328 Ark. 97, 940 S.W.2d 886 (1997). As was observed by the court in *Holt v. Taylor*, 242 Ark. 292, 413 S.W.2d 52 (1967):

> For a court to choose, in a custody case, between the mother and the father, the respective personalities of the parents are vital. It is in this realm that personal observation is of inestimable value. As was stated in *Wilson v. Wilson*, 228 Ark. 789, 310 S.W.2d 500 (1958): "We know of no type of case wherein the personal observation of the court mean more than in a child custody case." The chancellor's experience with these parents began in late 1962. In the succeeding years he entered at least ten orders touching on matters of divorce, child custody, and support money. These experiences afforded the chancellor opportunities to reach wise conclusions respecting the moral fiber of these parents. We are certainly justified in assuming that the chancellor's knowledge which he gained from the initial divorce proceedings, together with his four years' experience with these people, supports his conclusions with respect to custody. In cases of this nature, particular weight is given to the findings of the chancellor, *Cheek v. Cheek*, 232 Ark. 1, 334 S.W.2d 669 (1960).

*Id.* at 296, 413 S.W.2d at 54. Based on our review of this record, we refuse to substitute our judgment for that of the chancellor. It cannot be said that his decision is clearly against a preponderance of the evidence.

As for the concerns of the dissenting judges, proof of changed circumstances alone does not ordinarily justify a change in custody. In order for custody to be changed, there must not only be proof of a *material* change in circumstances, but that proof must also be accompanied by evidence that the change would be in the child's best interest. *Bennett v. Hollowell*, 31 Ark. App. 209, 792 S.W.2d 338 (1990). In finding no material change in circumstances affecting the best interest of the child, the chancellor could conclude that appellee's association with Boggs had no significant impact on the child, and he could consider that appellant and his

family, but not appellee, had exposed the child to Boggs's presence. With respect to overnight visits with appellee's fiance, the chancellor could observe that this only occurred on several occasions and that the two were to be married in a few weeks. While our courts have never condoned a parent's promiscuous conduct or lifestyle when conducted in the presence of the child, we have recognized the distinction between those human weaknesses and indiscretions which do not necessarily affect the welfare of the child, and that moral breakdown leading to promiscuity and depravity which does render one unfit to have custody of a minor child. *Hoing v. Hoing*, 28 Ark. App. 340, 775 S.W.2d 81 (1989).

■■ Also, that appellee may have violated the court's previous directives does not compel a change in custody. The fact that a party seeking to retain custody of a child has violated court orders is a factor to be taken into consideration, but it is not so conclusive as to require the court to act contrary to the best interest of the child. *Johnson v. Arledge*, 258 Ark. 608, 527 S.W.2d 917 (1975). To hold otherwise would permit the desire to punish a parent to override the paramount consideration in all custody cases, i.e., the welfare of the child involved. *Id.* Moreover, to ensure compliance with its orders, a chancellor has at his or her disposal the power of contempt. And, we have said that a court's contempt powers should be used prior to the more drastic measure of changing custody, *Carter v. Carter*, 19 Ark. App. 242, 719 S.W.2d 704 (1986), which is in keeping with the principle that custody is not to be changed merely to punish or reward a parent. *Harvell v. Harvell*, 36 Ark. App. 24, 820 S.W.2d 463 (1991).

Because it cannot be said that the chancellor's decision is clearly erroneous, we can only conclude that the dissenting judges have succumbed to the temptation to reach down from the appellate bench to overturn a decision that is simply not to their own personal liking. However, our sworn duty is to determine, from the record, whether the decision is clearly against the preponderance of the evidence, giving great weight to the superior ability of the chancellor to assess the credibility of the witnesses with whom he is more intimately familiar. From that perspective, we deem it unwise to second-guess the chancellor's decision that appellant failed to present sufficient proof of any material change in circum-

stances and that the child's welfare was not jeopardized by remaining in the custody of appellee.

PITTMAN, JENNINGS, and STROUD, JJ., agree.

ROBBINS, C.J., and CRABTREE, J., dissent.

JOHN B. ROBBINS, Chief Judge, dissenting. With sincerest respect to my colleagues who decided this appeal, I must express my strongest disagreement to the majority's decision today that leaves a little seven-year-old girl in the custody of her alcoholic mother who cannot conform her actions to the conduct ordered by a chancery court.

Change-of-custody proceedings involve two basic inquiries: first, whether there has been a material change of circumstances since the most recent custody order; and, if so, secondly, which parent should have custody with the sole consideration being the best interest of the child. *Schwarz v. Moody*, 55 Ark. App. 6, 928 S.W.2d 800 (1996). The trial court held in its June 1997 order that "there has been an insufficient change of circumstances to grant Plaintiff's Petition for change of custody and therefore same is hereby denied and dismissed." It is not clear whether the trial court found that appellant failed to meet the threshold test of proving that there had been a material change of circumstances, or whether the trial court found that the threshold test was met, but determined that it was in the best interest of the child that she remain in the custody of appellee. Whichever finding was made, I submit that, for the following reasons, the chancellor and the majority have erred.

As to whether appellant failed to prove that there had been a material change of circumstances since the December 1995 order, which left custody of the child with appellee, there are at least two undisputed changes that have occurred that I submit are both material and significant:

(1) Appellee associated with Johnny Boggs on numerous occasions, including a two-day period while on a drinking binge in March 1997.

(2) Appellee and the child stayed overnight on at least three occasions with her boyfriend at his apartment.

The order of December 11, 1995, was not appealed by either party. Because of appellee's history of having an abusive relationship with Johnny Boggs, the order expressly provided that appellee's custody was conditional and would terminate if she associated with Mr. Boggs. Appellee admitted at trial that she had been with Mr. Boggs on several occasions since entry of that order. While a custody change should never be imposed to punish or made without considering the best interest of the child, surely the violation of a clearly expressed condition of continued custody constitutes such a material change of circumstances as to at least open the door and permit the court to consider what the best interest of the child currently is in the matter of custody. Otherwise, the December 11, 1995, order's proviso was absolutely meaningless and its disregard undermines the integrity of the court.

I further submit that the other change in circumstances mentioned above is also significant and material. The December 11, 1995, order expressly enjoined the parties from overnight visits with someone of the opposite sex with whom they are romantically involved when the child was present. Since then, appellee admits that on at least three occasions she and the child have stayed overnight with her boyfriend, Thomas Johnston, at his apartment. This did not occur prior to the December 11, 1995, order because appellee and Mr. Johnston did not start dating until December 1995. Again, this contempt for the orders of the court may not be reason enough to change custody, but it should constitute such a material change in circumstances as to permit the trial court to consider anew with whom, in the best interest of the child, custody should be placed.

The foregoing facts are undisputed. Appellee admitted to these at trial. If the trial court found that there were insufficient changes of circumstances to permit reopening the issue of the best interest of the child, such finding was clearly against the preponderance of the evidence, and we are obliged, therefore, as an appellate court to substitute our judgment for that of the chancellor's.

The chancellor's decision could be construed as finding that, while there has been a material change of circumstances since the December 11, 1995 order, it continued to be in the child's best interest to remain in the appellee's custody. If so construed, I sub-

mit that such decision is also clearly against the preponderance of the evidence. The majority opinion has set forth an exhaustive summary of the evidence presented at trial, and I will not recount it here. There is one item of evidence, however, that is notable because of its omission.

Appellee testified that Brent Keeling, a man to whom she was never married, but who fathered her older daughter, stays with appellee in her trailer a week or two at a time, a few times each year. This man not only has mental problems, but is either physically abusive or has shown potential for physical abuse and is antisocial in the extreme. The parties' young daughter is exposed to Mr. Keeling during his visits to appellee's trailer.

The proof at trial clearly showed that the interest of the child would be better served in the custody of her father, especially with the support of his parents who are available to assist in her care. Appellee, an acknowledged alcoholic, admits to a two-day drunken binge in March 1997 during which she blacked out and of which she has very little memory. It is laudable that the trial court and majority wish to be forgiving of the appellee's conduct and not punish her. While I agree that custody should not be removed from appellee with the object of punishing her, we should not allow our grace to place her child at risk. It was to appellee's shame that she relapsed in March 1997 and was rendered unable to care for herself, much less her children. By leaving custody with appellee, it will be to our shame if she experiences another lapse and this seven-year-old child suffers harm as the result. We ought to protect the child from such a distinct possibility.

Appellee has shown by her conduct that she has little, if any, regard for the admonition and orders of the court. It is not in the best interest of the child to be in the custody of such a parent if a better alternative is available. I submit that the heavy preponderance of the evidence shows that it is in the best interest of this child to be in the custody of appellant and his parents. The chancellor's decision, as affirmed by the majority, is clearly erroneous and I would reverse.

CRABTREE, J., joins in this dissent.